SUPERIOR TRADING, LLC, JETSTREAM BUSINESS LIMITED, TAX MATTERS PARTNER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 20171–07, 20230–07,     Filed September 1, 2011.
20232–07, 20243–07,
20337–07, 20338–07,
20652–07, 20653–07,
20654–07, 20655–07,
20867–07, 20870–07,
20871–07, 20936–07,
19543–08.

R denied losses claimed by Ps, tax matters or other participating partners on behalf of purported partnerships, relating to distressed consumer receivables acquired from a Brazilian retailer in bankruptcy reorganization. R adjusted partnership items, attributing a zero basis to the receivables in lieu of the claimed carryover basis in the full face amount of the receivables. R determined accuracy-related penalties under sec. 6662(h), I.R.C., for gross valuation misstatements of inside bases. *Held*: Ps failed to establish that the distressed consumer receivables had any tax basis upon transfer from the Brazilian company. *Held*, *further*, the purported contribution of the receivables by the Brazilian company to a nominal partnership and the subsequent redemption of the Brazilian com-

---

[1] Cases of the following petitioners are consolidated herewith: Nero Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20230–07; Pawn Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20232–07; Howa Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20243–07; Queen Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20337–07; Rook Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20338–07; Galba Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20652–07; Tiberius Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20653–07; Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters Partner, docket No. 20654–07; Blue Ash Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20655–07; Lyons Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20867–07; Lonsway Trading, LLC, Bengley Fund, LLC, Tax Matters Partner, docket No. 20870–07; Sterling Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20871–07; Good Karma Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20936–07; and Warwick Trading, LLC, Jetstream Business Limited, a Partner Other Than the Tax Matters Partner, docket No. 19543–08.

pany's partnership interest are properly treated as a single transaction and recharacterized as a sale of the receivables. *Held*, *further*, Ps did not substantiate the amount paid for the receivables, and therefore the receivables have a zero basis for Federal tax purposes following their transfer. *Held*, *further,* Ps were unable to demonstrate good faith and reasonable cause, and therefore the accuracy-related penalties are sustained.

*Paul J. Kozacky*, *John N. Rapp*, *Jeffrey G. Brooks*, *John A. Cochran*, and *Ralph Minto, Jr.*, for petitioners.

*Lawrence C. Letkewicz* and *Laurie A. Nasky*, for respondent.

WHERRY, *Judge*: Each of these consolidated cases constitutes a partnership-level proceeding under the unified audit and litigation provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, sec. 402(a), 96 Stat. 648, commonly referred to as TEFRA. The issues for decision are: (1) Whether a bona fide partnership was formed for Federal tax purposes between a Brazilian retailer and a British Virgin Islands company for purposes of servicing and collecting distressed consumer receivables owed to the retailer; (2) whether this Brazilian retailer made a valid contribution of the consumer receivables to the purported partnership under section 721;[2] (3) whether these receivables should receive carryover basis treatment under section 723; (4) whether the Brazilian retailer's claimed contribution and subsequent redemption from the purported partnership should be collapsed into a single transaction and recharacterized as a sale of the receivables; and (5) whether the section 6662 accuracy-related penalties apply.

## *Background*

The alphabet soup of tax-motivated structured transactions has acquired yet another flavor—"DAD". DAD is an acronym for distressed asset/debt, the essential transaction at the core of these consolidated partnership-level proceedings. See the Commissioner's "Distressed Asset/Debt Tax Shelters/Coordinated Issue Paper", LMSB–04–0407–031 (Apr. 18, 2007). It

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

seems only fitting that after devoting countless hours in the last decade to adjudicating Son-of-BOSS transactions, we have now progressed to deciding the fate of DAD deals. And true to the poet's sentiment that "The Child is father of the Man", the DAD deal seems to be considerably more attenuated in its scope, and far less brazen in its reach, than the Son-of-BOSS transaction.

A Son-of-BOSS transaction seeks to exploit the narrow definition of a partnership liability under section 752 to conjure up a tax loss. For a detailed description of the contours of a prototypical Son-of-BOSS transaction, see *Kligfeld Holdings v. Commissioner*, 128 T.C. 192 (2007). In a nutshell, the Son-of-BOSS stratagem pairs a contingent liability that evades the reach of section 752 with an asset and contemplates a contribution of the liability-ridden asset to a purported partnership. The euphemistically termed "taxpayer" then claims an artificially inflated basis as a consequence of the contribution. Upon subsequently unwinding the contribution and settling the matching liability, the alleged partner contends that he has suffered a loss recognizable for tax purposes. See *id.*

By contrast, a DAD deal is more subtle. Instead of a claimed permanent tax loss manufactured out of whole cloth, a DAD deal synthesizes an evanescent one. The loss is proclaimed under authority of sections 723 and 704(c) from an alleged contribution of a built-in loss asset by a "tax indifferent" party to a purported partnership with a "tax sensitive" one. However, this loss is preordained to be nullified by a matching gain upon the dissolution of the venture. Consequently, the tax benefits sought by the tax sensitive party are, absent other factors, confined to timing gains. Moreover, claiming these benefits requires sufficient "outside basis", which, in turn, entails an investment of real assets.

Because of a DAD deal's comparatively modest grab and highly stylized garb, we can safely address its sought-after tax characterization without resorting to sweeping economic substance arguments. Those arguments have underpinned the judicial resolution of statutory provisions that have protected the public fisc against the attacks of Son-of-BOSS opportunists. See, e.g., *Cemco Investors LLC v. United States*, 515 F.3d 749, 752 (7th Cir. 2008); *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. 161, 185 (2009), affd. 408 Fed. Appx. 908 (6th Cir. 2010); *Jade Trading, LLC v. United*

*States*, 80 Fed. Cl. 11 (2007), revd. on other grounds 598 F.3d 1372, 1376 (Fed. Cir. 2010). Unlike the stilted single-entity Son-of-BOSS transaction, a DAD deal requires a minimum of two parties, with one willing to give up something of substantive value. In an arm's-length world, this would happen only if adequate compensation changed hands. Consequently, we need only look at the substance lurking behind the posited form, and where appropriate, step together artificially separated transactions, to get to the proper tax characterization. But we are getting ahead of ourselves.

FINDINGS OF FACT

I. *Introduction*

All of the consolidated cases involve, directly or indirectly, Warwick Trading, LLC (Warwick), an Illinois limited liability company. Our narrative begins on May 7, 2003, when Warwick entered into a Contribution Agreement (contribution agreement) with Lojas Arapua, S.A. (Arapua), a Brazilian retailer in bankruptcy reorganization.[3]

Arapua, a public company headquartered in Sao Paulo, Brazil, was at one time the largest retailer of household appliances and consumer electronics in Brazil.[4] Arapua's growth had been driven, in large part, by its consumer credit program. Arapua had been the first company in Brazil to grant credit directly to its retail customers in order to increase sales.

Many of Arapua's credit customers had become delinquent in their payments, and some of these delinquent accounts, constituting Arapua's past due receivables, were the subject of the contribution agreement. Pursuant to this agreement, Arapua purported to contribute to Warwick certain past due consumer receivables in exchange for 99 percent of the membership interests in Warwick. At different times during the latter half of 2003, Warwick, in turn, claims to have contributed varying portions of the Brazilian consumer receivables acquired from Arapua in exchange for a 99-percent member-

---

[3] Arapua had filed a petition on or about June 24, 1998, under the bankruptcy laws of Brazil. Arapua's petition initiated a proceeding termed "concordata", which is the rough equivalent of a ch. 11 bankruptcy reorganization under the U.S. Bankruptcy Code.

[4] Arapua became a public reporting company in 1995, and at all times relevant here, filed quarterly and annual audited financial statements with "Comissao de Valores Mobiliarios" (CVM), the Brazilian version of the U.S. Securities and Exchange Commission (SEC).

ship interest in each of 14 different limited liability companies (trading companies).[5]

Individual U.S. investors acquired membership interests in the various trading companies through yet another set of limited liability companies (holding companies). To accomplish this, Warwick contributed virtually all of its membership interests in each given trading company to the corresponding holding company. During the years at issue, Jetstream Business Limited (Jetstream), then a British Virgin Islands company, was the managing member of Warwick and of each of the trading companies and holding companies. The tax matters or other participating partners of Warwick and the trading companies have brought these consolidated actions on behalf of their respective entities.

All of these entities elected to be treated as partnerships for Federal income tax purposes and claimed a carryover basis in the Brazilian consumer receivables that were the subject of the contribution agreement. During 2003 and 2004, each of the trading companies wrote off almost the entire basis in its share of the Brazilian consumer receivables ostensibly resulting in business bad debt deductions and, in one instance, a capital loss.

Individual U.S. investors holding membership interests in a given trading company, through the corresponding holding company, claimed the benefits of these deductions on their respective Federal income tax returns. Warwick also claimed losses on the sale of membership interests in the holding companies to the individual U.S. investors. Pursuant to TEFRA's unified partnership-level audit provisions, respondent issued notices of final partnership administrative adjustment (FPAAs) denying these deductions and attacking the characterization of the transactions engaged in by Warwick and the trading companies on several grounds including lack of economic substance, the partnership antiabuse rules of section 1.701–2, Income Tax Regs., the disguised sale rules of section 707(a)(2)(B), and the transfer pricing rules of section 482.[6] Further, the FPAAs adjusted the partnerships'

---

[5] These trading companies, all of whose claimed deductions are at issue in these consolidated cases, are: Blue Ash Trading, LLC; Galba Trading, LLC; Good Karma Trading, LLC; Howa Trading, LLC; Lonsway Trading, LLC; Lyons Trading, LLC; Nero Trading, LLC; Pawn Trading, LLC; Queen Trading, LLC; Rook Trading, LLC; Sterling Trading, LLC; Superior Trading, LLC; Tiberius Trading, LLC; and Tiffany Trading, LLC.

[6] Respondent has since conceded the transfer pricing argument and declared that he "does not

bases in the receivables to zero and determined accuracy-related penalties for gross valuation misstatements under section 6662(h).

Petitioners timely petitioned the Court challenging the FPAAs. A trial was conducted the week of October 5, 2009, in Chicago, Illinois.

## II. *Mr. Rogers' Neighborhood*

The common thread that runs through these consolidated cases is a tax lawyer whose credentials and claimed expertise extend beyond tax law. Mr. John E. Rogers (Rogers) has a B.A. in mathematics and physics from the University of Notre Dame, a J.D. from Harvard Law School, and an M.B.A. from the University of Chicago, with a concentration in international finance and econometrics.

Rogers started his professional career in 1969 at the now-dissolved accounting firm Arthur Andersen, where he rose through the ranks to eventually become an equity partner. Rogers left Arthur Andersen in 1991 and went to work for a startup medical device company called Reddy Laboratories. The venture failed after the Food and Drug Administration denied the company's application for a license. In 1992 Rogers joined FMC Corp., a $5 billion company with operations in over 100 countries. Rogers served as FMC Corp.'s director of taxes and assistant treasurer through 1997.

In 1998 Rogers became an equity partner in Altheimer & Gray, a full-service law firm headquartered in Chicago, Illinois, with offices in Eastern Europe. Altheimer & Gray dissolved in 2003, and Rogers joined the Seyfarth Shaw, LLP (Seyfarth Shaw), law firm in July of that year. Rogers began as an income partner at Seyfarth Shaw but had become an equity partner in a little over a year. Rogers left Seyfarth Shaw at the end of May 2008, when he opened his own firm, Rogers & Associates.[7]

seek to reallocate the losses of Warwick or the trading companies to Arapua under I.R.C. § 482."

[7] Rogers is admitted to practice in the States of Illinois and Pennsylvania. He is also admitted to practice before the United States Tax Court, the Court of Appeals for the Seventh Circuit, the Court of Appeals for the Federal Circuit, the Court of International Trade, and the International Trade Commission.

Rogers is a member of the International Fiscal Association, an international tax group. He has also been a trustee of the Tax Foundation, a publicly supported foundation that researches tax policy issues and publishes papers. Rogers has worked with the Governments of Puerto Rico and Romania in developing programs implementing their industrial taxation programs. Rogers

Continued

Seeking to capitalize on his credentials as an international finance expert, Rogers asserts that he has developed a unique business model for simultaneously exploiting pricing inefficiencies in the retail and foreign exchange markets. The model consisted of servicing offshore consumer receivables and remitting the proceeds to the United States. Rogers claims that his expertise at analyzing probabilistic yield patterns enabled him to uncover hidden value in asset pools such as consumer receivables. Further, his keen understanding of macroeconomic factors underlying exchange rate movements supposedly allowed him to opportunistically time the acquisition and disposition of offshore assets. Both of these abilities came together in his project that entailed investing in and managing distressed retail consumer receivables overseas, which underlies this litigation.

After allegedly researching and testing several different countries, Rogers decided to begin with Brazil in 2003. Rogers attributes this choice to the then-underdeveloped nature of the Brazilian collections industry and the rapidly appreciating Brazilian currency. He settled on Arapua receivables for his initial foray, again after prospecting several large retail chains and their respective accounts receivables of varying vintage. He set up a tiered partnership structure for acquiring the Arapua receivables, consisting largely of postdated checks. Rogers contends that the tiered partnership structure was optimal given his envisaged exit strategy—a "roll up" followed by an initial public offering.

## III. *DAD's Army*

The deal began with the formation of Warwick and the transfer of distressed receivables from Arapua to Warwick. At the same time, Rogers formed a set of trading companies and a set of holding companies. As individual U.S. investors were found, Warwick transferred a portion of the receivables it had acquired from Arapua to a trading company, in exchange for a supermajority interest in the trading company. Concurrently, Warwick exchanged most of its interest

---

has written a number of publications, primarily on international tax matters, transfers of technology, the use of low-tax jurisdictions, and the compensation of executives outside the United States. In 1997 Rogers was invited to testify before the House Ways and Means Committee on fundamental international tax reform. Rogers has taught courses on international finance as an adjunct instructor at the Illinois Institute of Technology.

in the trading company for a supermajority interest in a holding company, which it then sold to the individual U.S. investor.

After a brief period, the trading companies claimed partially worthless debt deductions (and, in one instance, a capital loss) with respect to the receivables in which they held interests. The trading companies also claimed miscellaneous deductions for amortization and collection expenses. All deductions that the trading companies claimed flowed to the individual investors through the holding companies.[8] Warwick itself claimed losses on the sales of interests in the holding companies and deductions for amortization.

Rogers and petitioners describe the venture as one in which Arapua partnered with the following for servicing and collection of its "distressed" but "semi-performing" receivables. In the first instance, Arapua ostensibly partnered with Warwick; and through Warwick, with the trading companies; and subsequently, through the trading companies, with the respective holding companies; and through the holding companies, with the ultimate individual U.S. taxpayers.

As a consequence of this tiered partnership arrangement, Rogers and petitioners argue that pursuant to section 723, Arapua's tax basis in its receivables carried over to Warwick. Rogers and petitioners claim this basis equals the receivables' face amount without any downward adjustment to account for their "distressed" quality. At some point, shortly after transferring its receivables, Arapua was redeemed out of its purported partnership with Warwick. However, because Warwick had not made a section 754 election, the section 743(b) adjustment to the basis of partnership property did not apply. Thus, according to Rogers and petitioners, the basis of Arapua's receivables in the hands of Warwick remained unchanged at the receivables' face amount even after Arapua's redemption.

Soon thereafter, Warwick contributed the distressed receivables to various trading companies.[9] Under section 723, Warwick claimed a basis in its partnership interest in each trading company in the amount of Warwick's basis in the contributed receivables. This, in turn, equaled the receiv-

---

[8] See *supra* note 5, listing the trading companies whose claimed deductions are at issue in these consolidated cases.

[9] These include the companies listed *supra* note 5.

ables' face amount. Also, under section 723, the trading company took a basis in the receivables equal to Warwick's basis in these receivables—again, the receivables' face amount.

Finally, the various trading companies sold, exchanged, or otherwise liquidated the distressed receivables through an "accommodating" party for the receivables' fair market value. The resulting loss, equal to the spread between the face amount and the fair market value of the receivables, allegedly tiered up, and was allocated proportionately to the individual U.S. taxpayers holding membership interests in the holding companies under authority of section 704(c) and section 1.704–3(a)(7), Income Tax Regs.

For a U.S. taxpayer to be able to report his allocable share of the loss on his individual tax return, he must have had, pursuant to section 704(d), adequate adjusted outside basis in his partnership interest in his or her holding company. Therefore, the individual U.S. taxpayers were required to contribute a substantial amount of cash or other significant assets, such as an investment portfolio, to the holding companies to generate the required outside bases for section 704(d) purposes. Each individual U.S. taxpayer's outside basis was subsequently reduced in the amount of the allowed loss from the sale or exchange of the distressed receivables. Consequently, the individual U.S. taxpayer was, absent actual unintended and unsought partnership economic losses, destined to later have gain upon the redemption of his partnership interest. Thus, any tax savings afforded by Rogers' tax strategy would be limited to deferral benefits. Nonetheless, these timing gains can be substantial and build quickly.

## OPINION

### I. *Shutting the Barn Door*

As noted, the DAD deal delineated above entails a tax indifferent party purportedly contributing a built-in loss asset to a partnership, followed by a recognition of the built-in loss and its allocation to one or more tax sensitive parties. Without commenting upon whether the sought-after tax characterization of this deal could ever have materialized under prior law, we note that "Recent legislation has limited the ability to transfer losses among partners." *Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005–104 n.81.

The American Jobs Creation Act of 2004 (AJCA), Pub. L. 108–357, sec. 833, 118 Stat. 1589, amended sections 704, 734, and 743 effective for transactions entered into after October 22, 2004. The amendments to section 704 provide that in the case of contributions of built-in loss property to a partnership, the built-in loss may be taken into account only by the contributing partner and cannot be allocated to any other partners. The amendments to section 734 make the basis adjustment rules of that section mandatory to any distribution where there is a substantial basis reduction. Similarly, the basis adjustment rules of section 743 are made mandatory to a transfer of a partnership interest with a substantial built-in loss. Together, these statutory changes are intended inter alia to prevent shifting a built-in loss from a tax indifferent foreign entity to a U.S. taxpayer through the use of a partnership. See H. Conf. Rept. 108–755, at 627 (2004). [10]

Because the transactions that are the subject of these consolidated cases took place before October 22, 2004, none of the changes made by the AJCA to sections 704, 734, and 743 apply to them. Our discussion, therefore, will be based upon the prior state of the law.

II. *Competing Characterizations*

Petitioners contend that "In 1954, congress [sic] enacted 26 U.S.C. § 704(c), which calls for the tax result which the IRS challenges at trial". Petitioners point to "Treasury Regulation § 1.704–3(a)(7), promulgated in 1993, [which] states that a

---

[10] If changes made by the American Jobs Creation Act of 2004 (AJCA), Pub. L. 108–357, sec. 833, 118 Stat. 1589, were to apply to a transaction similar to the one devised and marketed by Rogers and described above, then any amount of the loss attributable to the spread between the face amount and the fair market value of the distressed receivables that exists upon contribution will not be allocable to the U.S. taxpayer. Under amended sec. 704, the entire amount of this built-in loss would be reserved for allocation to the tax indifferent foreign entity as the contributing partner. If the tax indifferent foreign entity leaves the partnership before the receivables are sold, then either amended sec. 734 or amended sec. 743 will apply to prevent the built-in loss from ever being recognized. The tax indifferent foreign entity could leave the partnership by a sale or transfer of its partnership interest or by means of a liquidating cash distribution. Upon a sale or transfer of the tax indifferent foreign entity's partnership interest, amended sec. 743 would require a downward adjustment to the U.S. taxpayer's share of the inside basis in the receivables. For a liquidating cash distribution, amended sec. 734 would require a similar downward adjustment to the partnership's inside basis in these receivables. Consequently, whether the tax indifferent foreign entity leaves via a sale or transfer of its partnership interest or by means of a liquidating cash distribution, the built-in loss in the receivables would be eliminated and could no longer become available for allocation to the U.S. taxpayer.

taxpayer 'must' allocate 'built-in' losses as Petitioners did here."

Petitioners cite "Two seminal cases, *Crane v. Commissioner*, 331 U.S. 1 (1947), and *Commissioner v. Tufts*, 461 U.S. 300 (1983), [to] establish the fundamental proposition that taxpayers get basis in assets purchased with borrowed money and may claim depreciation deductions—tax losses— on that basis." Consequently, petitioners find nothing illogical or unnatural in a result where tax losses exceed a taxpayer's economic losses.

Petitioners refer us to "*Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978), [where] the Supreme Court approved depreciation deductions for a taxpayer who borrowed virtually the entire purchase price to acquire a building". Petitioners assert that the Supreme Court approved an outcome in which the taxpayer "leased the building back to its original owner for virtually its entire life, leading to deductions—also known as tax losses—that vastly exceeded the taxpayer's cash investment."

Respondent counters that the "deductions and losses, claimed in the years 2003 and 2004, should be disallowed for * * * [several] reasons." Among the grounds that respondent advances is the argument that "The transactions engaged in by the trading companies had no independent economic substance."

We agree with petitioners that the mere fact that tax losses from a transaction exceed the accompanying economic losses does not render the transaction devoid of economic substance. Respondent contends at length that "Even assuming the most optimistic of revenue projections advanced by petitioners, the evidence is clear that the trading companies had no chance, let alone a realistic chance, of earning a single dollar of pre-tax profit." We are not so easily convinced. Petitioners introduced considerable evidence at trial, some of it quite credible, that servicing of distressed Brazilian consumer receivables was attracting the interest and investment dollars of legitimate and sophisticated U.S. investors during 2003 and 2004. Moreover, the actual receivables that the purported partnerships acquired had, in fact, generated nontrivial revenues,[11] though it was

---

[11] Petitioner's expert, Mr. Henry Dunphy (Dunphy), testified credibly about "protesto", a par-

not immediately apparent whether such revenues were large enough to justify the cash outlays.

However, we need not resolve these fact-intensive issues in order to rule on Warwick's and the trading companies' claimed losses and decide these cases.

III. *Validity of Contribution*

Two necessary conditions for the allocation of the built-in losses, in the Arapua receivables, away from Arapua and to the holding companies are: that Arapua be deemed to have formed a partnership with Jetstream; and that Arapua made a contribution, rather than a sale of the receivables, to that partnership.

Whether a valid partnership exists for purposes of Federal tax law is governed by Federal law. See *Commissioner v. Culbertson*, 337 U.S. 733, 737 (1949); *Commissioner v. Tower*, 327 U.S. 280, 287–288 (1946); *Frazell v. Commissioner*, 88 T.C. 1405, 1412 (1987). Labels applied to a transaction for purposes of local law are not binding for purposes of Federal tax law. See *Commissioner v. Estate of Bosch*, 387 U.S. 456, 457 (1967).

For Warwick to have constituted a partnership between Arapua and Jetstream for Federal tax law purposes at the time that Arapua transferred its receivables, Arapua and Jetstream should have had a common intention to collectively pursue a joint economic outcome. The so-called check-the-box regulation, section 301.7701–3(a), Proced. & Admin. Regs., certainly allows "An eligible entity with at least two members * * * [to] elect to be classified as * * * a partnership". However, we remain far from persuaded that Arapua and Jetstream ever came together to constitute an "entity" for this purpose.

"Respondent contends that * * * Jetstream and Arapua did not intend to join together as partners in the conduct of

_____

ticularly effective method for collecting on unpaid checks in Brazil. The method consists of issuing to the check-writer a notice from a semiofficial agency, providing a final opportunity to make an acceptable payment of the check. If no acceptable (often a negotiated reduced amount) payment is received in response, the check-writer's name is placed on a consolidated blacklist shared by all major Brazilian credit bureaus, adversely affecting the check-writer's "ability to buy anything on credit or open a bank account." Dunphy, who was engaged by petitioners as collections manager, employed the protesto method on the Arapua receivables with "a great deal of success". In his expert report and trial testimony, Dunphy indicated, on the basis of his prior experience and subjective analysis of comparables, that the collection yield on some selected tranches of the receivables could have been as high as 12 percent of the face amount.

a business." We agree. As respondent points out: "Arapua and Rogers, the sole owner and director of Jetstream, each had different agendas." Arapua's sole motivation appeared to be to derive cash for its receivables in order to avert or delay a forced liquidation. By comparison, among other things, "Rogers wanted the receivables * * * because of their purported built-in losses, which he could use to generate large tax deductions."

Along the same lines, and for similar reasons, we are unconvinced that Arapua ever made a bona fide contribution of the receivables. Under section 721(a), the basis of property contributed to a partnership is preserved so that unrecognized gain or loss is deferred until realized by the partnership. However, section 721(a) applies only to a contribution of property in exchange for "an interest in the partnership". Arapua was not seeking to partner with Jetstream in servicing and extracting value from the receivables. Instead, it was looking for ready cash. If Arapua never considered itself a partner in a joint enterprise with Jetstream, it could not have contributed the receivables within the meaning of section 721(a). See, e.g., *Wilkinson v. Commissioner*, 49 T.C. 4, 12 (1967) ("We cannot believe that a hurriedly organized tour through sections 721 and 731 could yield such an absurd result.").

The objective evidence regarding the stark divergence in the respective interests of Arapua and Jetstream with respect to the transfer of the receivables undermines petitioners' cause. Even more troubling is petitioners' failure to definitively account for Arapua's so-called redemption from the purported partnership. Petitioners failed to establish exactly when and how Arapua was paid to give up its claimed partnership interest in Warwick.[12] While insisting that "Arapua did not sell the receivables to Warwick", petitioners nonetheless acknowledge that "Arapua received cash

[12] Petitioners claim that "In or about March, 2004 Arapua was redeemed out of Warwick." Further, they insist that "Rogers believes that Arapua was paid fair value for its redemption, which is a discount from what it wanted." However, petitioners concede that "Rogers was unable to verify whether Arapua's redemption occurred in dollars or [Brazilian currency]". Moreover, petitioners are unable to quantify this amount in either currency. Petitioners argue in their posttrial brief that "The weight of evidence *suggests* that Arapua was eventually redeemed out of the partnership for approximately 1.5% of historical notional value of the receivables." (Emphasis supplied.) Rogers himself admitted at trial that "My belief at this—and continues at this point, it was about 1½ percent."

for its interest in Warwick" within a year after entering into the contribution agreement. [13]

Under section 707(a)(2)(B), partner contributions may be recharacterized as sales if the contributing partner receives distributions from the partnership that are, in effect, consideration for the contributed property. The accompanying regulations establish a 2-year "sale harbor" presumption on either side of the purported contribution. See sec. 1.707–3(c), Income Tax Regs. (stating that "if within a two-year period a partner transfers property to a partnership and the partnership transfers money or other consideration to the partner (without regard to the order of the transfers), the transfers are presumed to be a sale of the property to the partnership unless the facts and circumstances clearly establish that the transfers do not constitute a sale."). Petitioners have given us no reason to challenge respondent's assertion that as a result of Arapua's receipt of money within 2 years of transferring the receivables, "the transaction between Arapua and Warwick is presumed to be a sale under I.R.C. § 707(a)(2) and the regulations promulgated thereunder."

We may conclude from petitioners' failure to rebut this presumption that Arapua sold its receivables to Warwick rather than contributed them for a partnership interest. Consequently, the receivables' basis in Warwick's hands was their fair market value on the date of transfer instead of their historical basis in Arapua's hands. With a fair market value basis on the date of transfer, the receivables could yield few or no losses that Warwick or any of the trading companies may claim.

In addition to these foundational concerns that go to the very substance of whether a partnership was ever formed and whether a contribution was ever made, there remain questions regarding whether even the requirements of form were properly satisfied.

---

[13] Petitioners' posttrial brief states that "Arapua remained a partner in Warwick throughout 2003 and until March, 2004, when it was redeemed out of Warwick." And though petitioners characterize Arapua's redemption as occurring "much later than its contribution", the fact remains that by petitioners' own admission, Arapua received cash for its Warwick partnership interest on Mar. 1, 2004, less than 10 months after transferring the receivables under the May 7, 2003, contribution agreement.

IV. *Foot Faults*

Respondent introduced credible evidence at trial challenging compliance

with numerous requirements of Brazilian law, such as obtaining the approval of the trustee and the judge overseeing Arapua's bankruptcy proceeding, having the Contribution Agreement, with a complete list of receivables, translated into Portuguese and registered with a Public Registry of Deeds, and notifying the debtors of the assignments of their debts.

Petitioners countered with expert testimony of their own questioning the applicability of some of these requirements and suggesting that customary business practice in Brazil often diverges from formal requirements of the letter of the law.

We need not, and therefore do not, parse such conflicting testimony to decide definitively whether each applicable requirement of Brazilian law governing a transfer of title in the Arapua receivables was satisfied. It suffices for our purposes to note that petitioners carry the burden of establishing by a preponderance of the evidence that Arapua made a valid contribution of the receivables to a partnership within the meaning of section 721(a). See Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). By failing to credibly rebut respondent's evidence on this issue, petitioners have failed to carry their burden and, consequently, have not established a valid section 721(a) contribution. [14]

---

[14] Respondent's expert on Brazilian law, Mr. Sergio Tostes (Tostes), who has been a practicing lawyer in Brazil for over 35 years and is currently a senior partner in a well-respected firm, opined that the "Contribution Agreements between Warwick and the trading companies are foreign documents that are unenforceable in Brazil unless translated into Portuguese and registered with a Public Registry of Deeds. In the absence of such registration, the assignments of the receivables are not valid against third parties, including the debtors."

Petitioners' Brazilian law expert, Ms. Maria Helena Ortiz Bragaglia (Bragaglia), a partner in what Tostes acknowledged was one of Brazil's "leading firms", was of the opinion that the failure to render a Portuguese translation and obtain registration did not affect the contribution agreement's validity per se. She conceded, however, that these requirements would have to be satisfied before bringing suit to enforce the agreement in Brazilian courts and, therefore, for the agreement to be effective against third parties.

Bragaglia insisted that such third parties do not include the debtors, whose accounts were the subject of the contribution agreement. In her expert testimony, Bragaglia pointed to and outlined the legal research that supported her view. Tostes claimed that "The majority of Brazilian scholars, led by the highly respected jurist Caio Mario, are of the view that a third party is anyone who is not a party to the agreement. In this case, that would include the debtors, since they are not parties to the Contribution Agreements."

We need not, and do not, resolve the competing claims by Tostes and Bragaglia on this issue. Instead, we merely note that Bragaglia's testimony fails to conclusively determine the weight of Brazilian legal authority bearing upon this question. Therefore, by relying exclusively on her expert opinion, petitioners have failed to adequately establish that the contribution agreement

## V. *Arapua's Financial Reporting*

Finally, even assuming arguendo that Arapua validly contributed the receivables to a bona fide partnership so that Warwick would inherit Arapua's basis in the receivables, we are not convinced that that basis would equal the receivables' face amount. In fact, respondent offered compelling and unrebutted evidence suggesting that even a carryover basis for the receivables would be closer to zero than to their face amount. Respondent showed that "the receivables which Arapua transferred to Warwick had previously been contributed to, and returned by, another limited liability company, MPATRN, LLC" in 2002, before the purported contribution of the same receivables to Warwick. [15] Moreover, as respondent argues, after the receivables were returned to Arapua, "Arapua removed the receivables from its balance sheet,

<hr>

would be enforceable against the debtors. In the absence of such enforceability, we cannot conclude that the contribution agreement effected a contribution of the receivables from Arapua to Warwick recognizable for U.S. tax purposes.

There was a similar difference in opinion between these two Brazilian law experts regarding any requirement for obtaining prior approval of the contribution agreement from "Arapua's creditors and the trustee and the judge overseeing the concordata". Tostes asserted that these parties "had a right to challenge the Contribution Agreement and would have done so if it had been brought to their attention directly prior to its execution". Bragaglia contended that mention of the contribution agreement in Arapua's quarterly and annual financial reports, which were placed in the files of the concordata proceeding, sufficed. Again, we refrain from choosing between these differing opinions regarding Brazilian law and, instead, focus on the commonality between them. Reconciling the two expert testimonies, we conclude that prior approval of the contribution agreement would not have been required if the agreement constituted Arapua's "ordinary course of business" during its bankruptcy reorganization. Petitioners have not convinced us that the contribution agreement in fact comprised routine and normal operations for Arapua during that time. To the contrary, Rogers indicated in his trial testimony that he had "determined that Arapua's receivables were strategically valuable to the company" and Arapua viewed the contribution agreement with Warwick as a strategic partnering arrangement. We take that testimony to mean that Arapua was, as to a material asset, venturing out into hitherto unexplored territory, a premise inconsistent with ordinary course of dealings.

[15] Respondent has presented credible circumstantial evidence that supports this finding. Respondent has shown that: (1) "On June 1, 2002, Arapua transferred * * * defaulted receivables which were more than 180 days past due to MPATRN, LLC"; (2) "By May 2003, Arapua had received * * * 1.7% of the face amount, and MPATRN, LLC had returned * * * [the remainder] of the receivables to Arapua; (3) "Sometime before May 7, 2003, Rogers obtained a copy of the audited financial statement which Arapua had submitted to the CVM [the Brazilian version of the U.S. SEC, see *supra* note 4] for the period ended Dec. 31, 2002. As a consequence, Rogers was aware that Arapua had transferred receivables to MPATRN, LLC"; (4) and Rogers subsequently negotiated for a putative contribution of these receivables to Warwick. Petitioners counter this carefully reconstructed and plausible narration of likely facts with a blanket denial, stating that "Respondent has presented no evidence that the defaulted receivables purportedly transferred by Arapua to MPATRN are the same, similar or related to the Arapua Receivables contributed to Warwick." Petitioners have failed to convince us that the Arapua receivables that were the subject of the contribution agreement had not been previously transferred and reacquired by Arapua.

raising a serious question whether Arapua had any basis in the receivables which could carry over to Warwick."

Petitioners counter by arguing that a zeroing out of the receivables from Arapua's accounting statements prepared for financial reporting purposes is not determinative of their proper tax treatment for Federal tax purposes.[16] We acknowledge

the vastly different objectives that financial and tax accounting have. The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. * * * Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism. * * * [*Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542 (1979).]

Regardless, we shall not simply ignore the fact that Arapua's management believed, albeit conservatively, that the receivables were close to worthless. "The primary goal of the income tax system * * * is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc." *Id.* In pursuit of that goal, we may properly consider Arapua's internal assessment of the receivables' intrinsic value, and its implied unrecovered cost of the assets, in imputing a basis to the receivables for section 721(a) purposes. After all, "the purpose of § 721 is to facilitate the flow of property from individuals to partnerships that will use the property productively * * * [by preventing] the mere change in form from precipitating taxation." *United States v. Stafford*, 727 F.2d 1043, 1048, 1053 (11th Cir. 1984).

Since the Arapua receivables were never within the purview of Federal taxation before their transfer to Warwick, we see no reason why, at least in this instance, we may not derive these receivables' proper Federal tax basis from their reported value on Arapua's financial statements at the time

---

[16] Petitioners acknowledge "a large accounts receivable balance * * * in 2001 and then a smaller number * * * in 2002", accompanied by a similar decline in the provision for doubtful debts over the same period. Though petitioners concede that "a large part of the receivables were no longer there", they counter that "Rogers does not know if, in fact, the * * * Arapua Receivables were previously transferred to MPATRN." Petitioners emphasize that "the losses with respect to the [eliminated] receivables were not used for the reduction of taxes (charged-off)." They claim that Arapua's financial accounting disclosure of a decline in receivables "did not tell Rogers whether the Arapua Receivables were written off for U.S. tax purposes. * * * Rogers' inference is that the receivables * * * were not written off for U.S. tax purposes, but that a tax re-contribution to capital of a partnership was made."

of transfer. Again, petitioners have failed to persuade us otherwise. [17]

The grounds we have discussed thus far, viz, failure to establish a bona fide partnership and a valid contribution, and contravention of applicable local law requirements, are sufficient to sustain respondent's FPAAs and deny Warwick and the trading companies the claimed losses. Yet we choose not to stop here. We persevere for two related reasons. First, we wish to underscore that petitioners' failings are not merely those that could have been remedied with proper execution of the contemplated transaction. The transaction here is inherently flawed and will not deliver the sought-after tax consequences. Rogers' knowledge of tax law and experience with tax practice should have put him on notice of this obvious flaw. His failure to take such notice and the issues analyzed above support the application of the section 6662 accuracy-related penalty that respondent has determined.

## VI. *Stepping Stones*

Rogers arranged for a sequence of convoluted and inter-related steps to proceed with the acquisition and servicing of the Arapua receivables. Other than the tax outcome he sought, there was no logical reason for the many inter-mediate exercises. Arapua's purported membership in Warwick was engineered solely to obtain a carryover basis for the receivables and retain their built-in loss. Further, Arapua's subsequent redemption was apparently contrived to complete a disguised purchase of the receivables and remove Arapua

---

[17] Respondent's Brazilian law expert, Tostes, opined that "Arapua had certainly written off the receivables for both financial and tax reporting purposes by May 7, 2003, when it transferred them to Warwick." Petitioners contend that "independent auditors viewed the Arapua financials and concluded that the receivables were recorded as credits in Arapua's balance sheet as taxable income in the end of the year income statement, thus proving Rogers' belief that Arapua did not 'charge-off' the receivables for reduction of taxes in any year". Since Rogers was not admitted as an expert in Brazilian law, his beliefs are irrelevant for the purpose of determining the receivables' prior Brazilian tax treatment. Petitioners counter Tostes' expert opinion by claiming that "According to Mr. Tostes, examination of the Arapua financial statements does not allow a definitive conclusion that the Arapua Receivables were written off." However, the burden of establishing that the receivables had a carryover basis is on petitioners, and they fail to meet that burden by merely suggesting that respondent's expert allows for a possibility that the receivables might have had some tax basis under Brazilian law. Finally, petitioners point to Rogers' conclusion that the receivables "had not been charged off in any way pursuant to U.S. income tax law." Other than revealing petitioners' keen grasp of the obvious, this contention has little probative value since the receivables were never within the purview of Federal taxation before their transfer to Warwick.

from the picture when the built-in loss was recognized. The recognized loss could then be allocated away from Arapua and entirely to the holding companies. In other words, Arapua's entry and exit were timed to maneuver in between the constraints of partnership tax accounting rules to preserve and bring to fruition an alleged tax loss.

Are we at liberty to collapse or step together the transaction's intermediate points and, in effect, trace a direct path? In answering this question, we begin with the general proposition that a transaction's true substance rather than its nominal form governs its Federal tax treatment. See generally *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935).

Before we can recast this or any transaction in a manner that makes its underlying substance obvious and relegates its overt form to the background, we subject the transaction's many twists and turns to "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." *Harris v. Commissioner*, 61 T.C. 770, 783 (1974); see also *Gordon v. Commissioner*, 85 T.C. 309, 324 (1985) (holding that "formally separate steps in an integrated and interdependent series that is focused on a particular end result will not be afforded independent significance in situations in which an isolated examination of the steps will not lead to a determination reflecting the actual overall result of the series of steps"); *Smith v. Commissioner*, 78 T.C. 350, 389 (1982) (applying the step transaction doctrine "in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. * * * In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged.").

Courts generally apply one of three alternative tests in deciding whether to invoke the step transaction doctrine and disregard a transaction's intervening steps. These tests, in increasing degrees of permissiveness are: The binding commitment test, the end result test, and the interdependence test.

The least permissive of the three tests, the binding commitment test, considers whether, at the time of taking the first step, there was a binding commitment to undertake

the subsequent steps. See *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968) (holding that "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps"). In applying this test, we ask whether at the time of Arapua's supposed contribution of the receivables, it was assured of being subsequently redeemed out of Warwick.

Though there has been no specific finding of fact on this issue, we observe that in the absence of any such redemption of Arapua's so-called partnership interest, the tax losses would have remained Arapua's and could not have been allocated to the holding companies. Thus, the very design of the transaction contemplated a subsequent redemption of Arapua from Warwick. However, the binding commitment test "is seldom used and is applicable only where a substantial period of time has passed between the steps that are subject to scrutiny." *Andantech LLC v. Commissioner*, T.C. Memo. 2002–97, affd. in part and remanded in part 331 F.3d 972 (D.C. Cir. 2003).

Less than a year elapsed between Arapua's entering into the contribution agreement and its claimed redemption from Warwick. [18] It is unclear whether the binding commitment test is appropriate in these circumstances. See *id.*; see also *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 n.6 (10th Cir. 1991) (declining to apply the binding commitment test because the case did not involve a series of transactions spanning several years).

The end result test focuses on the parties' subjective intent at the time of structuring the transaction. See *True v. United States*, 190 F.3d 1165, 1175 (10th Cir. 1999) (holding that what matters is not whether the parties intended to avoid taxes but if they intended "to reach a particular result by structuring a series of transactions in a certain way"). The test examines whether the formally separate steps are prearranged components of a composite transaction intended from the outset to arrive at a specific end result. We have no hesitation in concluding that under the end result test, we can safely invoke the step transaction doctrine here. By petitioners' own admission, the tax benefits were a legitimate inducement for individual U.S. investors to invest in the ven-

---

[18] See *supra* notes 12 and 13 and accompanying text.

ture. But arranging for these tax benefits required the carefully choreographed entry and exit of Arapua. Such entry and exit could not but have been previously arranged to reach the desired end result—allocation of the recognized tax loss away from Arapua.

The third, and least rigorous, of the tests is the interdependence test. This test analyzes whether the intervening steps are so interdependent that the legal relations created by one step would have been fruitless without completion of the later series of steps. See *Penrod v. Commissioner*, 88 T.C. 1415, 1428–1430 (1987). If, however, intermediate steps accomplished valid and independent economic or business purposes, courts respect their independent significance. See *Greene v. United States*, 13 F.3d 577, 584 (2d Cir. 1994); *Sec. Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1246–1247 (5th Cir. 1983).

In applying the interdependence test, we ask whether any economic or business purpose was served by Arapua's entry to, and exit from, Warwick. Alternatively, we question whether an outright sale of the Arapua receivables would have been just as effective in transferring title and facilitating their subsequent servicing. In either formulation, the test is satisfied and we are free to invoke the step transaction doctrine and collapse the formal steps into a single transaction.

Note that the three tests we outline above are not mutually exclusive. Arguably the requirements of all, and certainly of two of the three tests, have been met here. Moreover, a transaction need only satisfy one of the tests to allow for the step transaction doctrine to be invoked. See *Associated Wholesale Grocers, Inc. v. United States*, *supra* at 1527–1528 (finding the end result test inappropriate but applying the step transaction doctrine using the interdependence test).

We conclude that the various intermediate steps of the transaction structured and put into operation by Rogers are properly collapsed into a single transaction. This transaction consisted of Arapua's selling its receivables to Warwick for the amount of cash payments that were eventually made to Arapua by and on behalf of Warwick. Consequently, Warwick's basis in the Arapua receivables was no higher than the sum of these payments—but petitioners have failed to

substantiate these payments.[19] Any subsequent losses are, therefore, properly measured against a basis of zero.

## VII. *Accuracy-Related Penalty*

Respondent determined that "there is a gross valuation misstatement within the meaning of I.R.C. § 6662(h)" in all the consolidated cases. Under section 6662(e) and (h)(2)(A)(i), a gross valuation misstatement would arise if the adjusted basis of any property "claimed on any return of tax imposed by chapter 1" is 200 percent or more of the amount determined to be correct. If the correct adjusted basis is found to be zero, any positive amount claimed on the return would constitute a gross valuation misstatement.

Respondent contends that the correct basis of the receivables in the hands of both Warwick and the trading companies is zero.[20] Because petitioners have failed to substantiate the amount of payments Warwick made to Arapua for the receivables, and more importantly that they were contributed, we agree with respondent. Therefore, we conclude that there are gross valuation misstatements on the respective returns of Warwick and the trading companies. Consequently, the applicable accuracy-related penalty is 40 percent in each of the consolidated cases.

Under section 6664(c)(1), an accuracy-related penalty will not be imposed if we find that Warwick and the trading companies acted with reasonable cause and in good faith. We make this determination at the partnership level, taking into account the state of mind of the general partner. See *New Millennium Trading, LLC v. Commissioner*, 131 T.C. 275 (2008).

---

[19] See *supra* note 12 and accompanying text.

[20] Each partnership's basis in the receivables is part of that partnership's inside basis and is therefore a "partnership item" within the meaning of sec. 6231(a)(3) and sec. 301.6231(a)(3)–1, Income Tax Regs. Consequently, "we do have jurisdiction over the penalty in this partnership-level case". *106 Ltd. v. Commissioner*, 136 T.C. 67, 75 (2011). "Since the overvalued * * * [asset] was a partnership item, the outside basis of individual partners is of no consequence." *Id.* at 76. Thus, our assertion of jurisdiction over penalties here is not affected by, and is distinguishable from, the respective opinions of two Courts of Appeals which have held that a trial court lacks jurisdiction to determine partners' outside bases in partnership-level proceedings. See *Petaluma FX Partners, LLC v. Commissioner*, 591 F.3d 649, 654–656 (D.C. Cir. 2010), affg. in part, revg. in part, vacating in part and remanding on penalty issues 131 T.C. 84 (2008); *Jade Trading, LLC v. United States*, 598 F.3d 1372, 1379–1380 (Fed. Cir. 2010). Further, a "portion of any underpayment [by the individual U.S. investors] * * * is attributable to" the gross valuation misstatement of the receivables within the meaning of sec. 6662(b).

For Warwick and each of the trading companies, Jetstream was the managing member at the time the transactions at issue transpired. Rogers was the sole owner and director of Jetstream at all such times. Consequently, he was the only individual with the authority to act on behalf of petitioners. It is therefore Rogers' conduct that is relevant for the purpose of determining whether we should sustain the asserted accuracy-related penalties.[21]

There has been no showing of reasonable cause or good faith on Rogers' part in conceptualizing, designing, and executing the transactions. To the contrary, as we have detailed above, Rogers' knowledge and experience should have put him on notice that the tax benefits sought by the form of the transactions would not be forthcoming and that these transactions would be recharacterized and stepped together to reveal their true substance.

## VIII. *Conclusion*

We uphold respondent's FPAAs. We conclude that the Arapua receivables had zero basis in Warwick's hands. We further sustain respondent's determination regarding the section 6662(h) accuracy-related penalty. We find that petitioners have failed to establish reasonable cause or good faith under section 6664(c).

We have considered all the other arguments made by petitioners, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

> *Decisions will be entered for respondent.*

---

[21] Since none of the partnerships relied upon external "professional advice" within the meaning of *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002), the three-factor test developed there is irrelevant for establishing reasonable cause and good faith in these partnership-level proceedings.