T.C. Memo. 2014-141

UNITED STATES TAX COURT

JOHN E. ROGERS AND FRANCES L. ROGERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7390-10.                                Filed July 17, 2014.

In 2004 Ps owned and operated several tiered business entities
that promoted tax sheltered investments involving the purchase and
sale of Brazilian receivables, brokered and developed real property,
and attempted to bring a medical device to market. Ps failed to report
as income some of the gross receipts of their business entities, and Ps
contend that the unreported amounts were held "in trust" for another
related entity. Ps' business entities claimed deductions associated
with their operations that Ps could not substantiate.

Ps also failed to report on Schedule C all of the income from
P-H's attorney activity, claimed some deductions for that activity that
they could not substantiate, and failed to deduct certain amounts that
they did expend.

By notice of deficiency issued in 2010, R determined that Ps
did not report all of their income and that some of their claimed

**[*2]** deductions were unsubstantiated and must be disallowed. R also determined that Ps are liable for an accuracy-related penalty.

Held: With a few exceptions, Ps failed to substantiate their entitlement to business expense deductions beyond those R already allowed.

Held, further, Ps failed to include certain amounts in gross income that should have been reported on their tax return.

Held, further, certain receipts of one of Ps' business entities were not held in trust and were properly includable in that entity's gross receipts.

Held, further, Ps are liable for an accuracy-related penalty.

John E. Rogers, for petitioners.

Ronald S. Collins, Jr., for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge: The Internal Revenue Service ("IRS") issued to petitioners, John E. and Frances L. Rogers, a statutory notice of deficiency pursuant to section 6212[1] on December 29, 2009, for petitioners' 2004 tax year.

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.; "Code") as in effect for 2004, and all citations

(continued...)

**[*3]** In the notice the IRS determined that petitioners had a deficiency in tax of $466,117 and that they are liable for a corresponding failure-to-file addition to tax of $100,824 and an accuracy-related penalty of $37,908. This case arises from petitioners' timely petition pursuant to section 6213 for redetermination of the deficiency and the penalties in the notice of deficiency.

After stipulations by the parties, the issues for decision are: (1) whether petitioners substantiated their entitlement to business expense deductions beyond those that respondent allowed (with a few exceptions, we hold that they did not); (2) whether petitioners failed to include certain amounts in gross income that should have been reported on their return (we hold that they did to the extent described below); (3) whether certain receipts of Mr. Rogers' business entity were held in trust or were includable in the entity's gross receipts (we hold they were includable in the entity's gross receipts); and (4) whether petitioners are liable for the accuracy-related penalty under section 6662 (we hold that they are).

                          FINDINGS OF FACT

At the time they filed their petition, Mr. and Mrs. Rogers resided in Illinois. In 2004 Mr. Rogers worked as an attorney and Mrs. Rogers worked as a realtor.

---

[1](...continued)
of Rules refer to the Tax Court Rules of Practice and Procedure.

In addition, Mr. Rogers operated a number of entities, including A&G Investors III, Portfolio Properties, Inc. ("PPI"), Sterling Ridge, Inc., Jetstream Business, Ltd. [*4] ("Jetstream"), Abingdon Trading, LLC ("Abingdon"), and Lucas & Rogers Capital, Inc. ("L&R"). Most of the adjustments in dispute relate to income and deductions Mr. Rogers claimed for PPI activities and in connection with his activities as an attorney.

Frances L. Rogers

During 2004 Mrs. Rogers earned a salary as an associate principal of a Chicago area high school. She was also a licensed real estate broker and an attorney.

John E. Rogers

As we have previously found:[2]

Rogers is a tax attorney with over 40 years of experience. He received a law degree from Harvard University in 1967 and a master's degree in business administration from the University of Chicago. He worked in the tax department of Arthur Andersen for over 24 years before serving for 7 years as the tax director and assistant treasurer at FMC Corp. In 2003 Rogers was a partner with

_____

[2]For 2003 (the year before the 2004 taxable year at issue) petitioners litigated their income tax liability in Rogers v. Commissioner, T.C. Memo. 2011-277 ("Rogers I"), aff'd, 728 F.3d 673 (7th Cir. 2013). That 2003 case involved issues equivalent to some of the issues in this 2004 case. Our record in this case establishes many of the facts that we also found in Rogers I, and those facts are noted below.

the law firm Altheimer & Gray until its bankruptcy on June 30, 2003. For the remainder of the year Rogers was a partner with the law firm

[*5] Seyfarth Shaw, LLP.  [Rogers v. Commissioner, T.C. Memo. 2011-277 ("Rogers I"), slip op. at 3, aff'd, 728 F.3d 673 (7th Cir. 2013).]

Mr. Rogers' partnership at Seyfarth Shaw, LLP ("Seyfarth Shaw"), continued through 2004, and in that year he received compensation from the firm (about which there is no dispute in this case).

In addition, Mr. Rogers conducted activity on his own in 2004, for which he received compensation and for which he attached to his 2004 return a Schedule C, "Profit or Loss From Business", that identified the business activity as "Attorney". In 2004 he also promoted to clients "tax-advantaged" transactions that dealt with the acquisition of, and sales of indirect interests in, Brazilian consumer receivables, using multiple entities that he controlled (as discussed below).[3]

PPI, Jetstream, and Sugarloaf

Rogers set up three business entities to manage numerous holding and trading companies used in the Brazilian receivable

---

[3]The details of these transactions are currently being litigated in the separate case of Sugarloaf Fund, LLC v. Commissioner, docket No. 671-10.  The instant case is an offshoot of those transactions, though the consumer receivables transactions themselves are not before us.  Rather, at issue here is the income to Mr. Rogers (either directly or indirectly from his entities) for his promotion of the transactions.

transactions. The first, PPI, was incorporated under the laws of Illinois on April 1, 1989, and elected on January 1, 1992, to be treated as an S corporation under section 1361(a)(1). Rogers was its sole shareholder. The second, Jetstream Business Limited (Jetstream), a **[*6]** British Virgin Islands limited company, was formed by Rogers with PPI as its sole shareholder. Rogers was Jetstream's only director. In 2003 Jetstream was treated as a disregarded entity for Federal tax purposes. * * * [Rogers I, slip op. at 3-4.]

Mr. Rogers formed the third entity in 2001--the Delaware limited liability company called Sugarloaf. In 2004 Jetstream was the managing member and tax matters partner of Sugarloaf. Thus, in 2004 Mr. Rogers had control over PPI, Jetstream, and Sugarloaf. During 2004 Sugarloaf entered into transactions directly and through affiliated entities for, in effect, acquiring distressed Brazilian consumer accounts receivable and selling interests in them to numerous investors through trading and holding companies. Sugarloaf was a putative partnership subject to the unified partnership audit procedures of TEFRA (sections 6221-6234). Mr. Rogers indirectly owned an interest of no more than 1% in Sugarloaf, through PPI and Jetstream.

Abingdon Trading

During 2004 Mr. Rogers was also a member of Abingdon, which engaged in various business ventures, the specifics of which are not relevant to this case. In that year he received a $9,000 partnership distribution from Abingdon.

[*7] Mr. Rogers' business income

In 2004 Mr. Rogers received the following payments from the following sources:[4]

| Entity | Amount |
|--------|--------|
| PPI | $413,000 |
| Sugarloaf | 50,000 |
| Jetstream | 20,000 |
| Peninsula Yorkshire Fund | 10,000 |
| Abingdon | 9,000 |
| Total | 502,000 |

Of that total, Mr. Rogers reported on Schedule C only $284,600, which the parties agree included $178,000 of the amount he received from PPI. Mr. Rogers did not report the remaining $235,000 distribution from PPI as income in 2004. Petitioners had no obligation to transfer the $235,000 to anyone, to hold the funds in escrow, or to segregate the funds from their personal funds. However, in 2004 Mr. Rogers made capital contributions of $395,900 to PPI (which was, as we

---

[4]Petitioners did not report all these amounts on their return, but the IRS discovered them during its examination, when it performed a bank deposits analysis on petitioners' joint checking account at LaSalle Bank (ending in 8121) to determine the amount of petitioners' gross income in 2004.

stated, his wholly owned S corporation).

[*8] In connection with his business activities, Mr. Rogers used his home and vehicles and incurred certain expenses, which he deducted on his Schedule C. After stipulations, the deductibility of $127,756 of the claimed expenses remains in dispute. Those disputed expenses are listed in appendix A to this opinion.

Under the burden of proof and legal principles discussed in part IV, below, we find that Mr. Rogers incurred, in connection with his "Attorney" activity, only a portion of these disputed expenses--i.e., deductible business gift expenses of $100, copying expenses of $14, dues and subscriptions expenses of $156, and business travel expenses of $30,230 on behalf of PPI (deductible on Schedule C); and that he incurred $4,308 of unreimbursed employee business expenses (deductible on Schedule A, "Itemized Deductions") in connection with his employment at Seyfarth Shaw.

We find that petitioners have not substantiated either the expenditure or the business purpose (or both) of the remaining $91,343 of the expenses listed in appendix A and discussed in part IV below.

Lucas & Rogers Capital, Inc.

L&R was a second S corporation for which Mr. Rogers was the sole shareholder. Its activity included a real estate brokerage business, holding

licenses for real estate brokers, and property management for third parties.  The [*9] record contains no evidence that PPI owned any interest in L&R, nor any evidence that L&R owned any interest in PPI.  But for reasons we cannot tell, PPI shared a bank account with L&R, which we refer to as the "joint PPI/L&R account".

For 2004, on its return prepared by Mr. Rogers, L&R reported $450,000 of gross receipts, and PPI deducted $450,000 as "L&R fees" on its Form 1120S, "U.S. Income Tax Return for an S Corporation"; but the parties have stipulated that no transfer of $450,000 was ever made.  We find that L&R did not receive the income it reported, and that PPI did not incur the expense it deducted.

PPI's and L&R's gross receipts

Total deposits into the joint PPI/L&R account equaled $1,566,960 in 2004.  Of the total deposits, $389,900 was capital contributions made to PPI by Mr. Rogers; and $67,911 of the total deposits was the proceeds of a loan.  Neither the capital contributions nor the loan proceeds were taxable income of PPI or L&R.  The remaining $1,108,786 consisted of taxable deposits that were gross receipts of either PPI or L&R.  In addition, PPI received income that was not deposited into the joint PPI/L&R account, but that was recorded on PPI's general ledger as income:  (a) $34,000 from "Agresti" recorded as "Management Income";

(b) a $2,000 payment by "Peabody"; and (c) $200,000 from an unknown source

[*10] recorded as "income". Neither Sugarloaf, Jetstream, PPI, nor petitioners themselves had any obligation to transfer any of these receipts to anyone, to hold the funds in escrow, or to segregate the funds from any other use. PPI's and L&R's taxable receipts from the above sources therefore totaled $1,344,786-- $1,271,070 attributable to PPI and $73,716 to L&R.[5]

PPI's business expenses

In 2004 PPI rented office space in Homer Glen, Illinois, from Palos Bank. For that office and other reported expenses, PPI claimed deductions on its 2004 tax return. After stipulations, the deductibility of $608,310 of those expenses remains in dispute. Those disputed expenses are listed in appendix B to this

---

[5]PPI did not report all of those receipts. Rather, on its 2004 Form 1120S PPI reported only $846,070 (later adjusted by agreement of the parties to $846,066) of gross receipts or sales consisting of: $149,966 from real estate commissions; $34,000 from Thomas Agresti; $124,500 from GTG Corp.; $220,000 from Multicred Investamentados Limitada ("Multicred"); $137,500 from Raul Marquez; $90,000 from Thomas McKelvey; and $90,100 from two unidentified sources. The parties also stipulated that PPI received $425,000 from Sugarloaf during 2004, none of which was reported on PPI's return. If that amount is added to the gross receipts that PPI did report, the resulting total is $1,271,070, which we find is the portion of the gross receipts attributable to PPI. We attribute the remaining $73,716 to L&R, since the record seems to show some activity by L&R in 2004, and it is the sole apparent possible recipient of those receipts. Whether received by PPI or L&R, the income ultimately flows through to petitioners.

opinion.

**[*11]** Under the burden of proof and legal principles discussed in part I below, we find that PPI incurred the following deductible expenses:

| Expense | Amount |
|---|---|
| Commissions: | |
| Portfolio Asset Recovery Consultoria e Assessoria Empresarial LTDA | $50,000 |
| Multicred Investamentados Limitada | 25,000 |
| Other commissions | 17,465 |
| Meals and entertainment | 402 |
| Total | 92,867 |

We find that petitioners have not substantiated either the expenditure or the business purpose (or both) of the remaining $515,443 of the expenses listed in appendix B and discussed in part V.B below.

One of the larger disputed deductions that we find unsubstantiated was "PTI Subsidy". Portfolio Technologies, Inc. ("PTI"), was an Illinois corporation organized in 1997 by Mr. Rogers. He remained a shareholder and officer of the company throughout 2004. PTI was involved in bringing a new medical device to market, which ultimately resulted in PTI's involvement in patent litigation.

Mr. Rogers testified he was "the largest shareholder eventually" of PTI, though the

**[*12]** precise extent of his ownership interest in PTI was not established at trial.

(L&R also owned an unspecified number of shares in PTI during 2004. The

record contains no evidence that PPI, Jetstream, or Sugarloaf owned any interest in

PTI.) The evidence at trial did not establish whether PTI was solvent or insolvent,

but it is clear that PTI was under threat from an infringer. Mr. Rogers owned a

residual or royalty right to PTI's profits after large bank loans had been paid off,

and the value of that right depended on PTI's survival. The alleged "PTI Subsidy"

expense consisted of two payments by Mr. Rogers to Global Protection Corp.

("GPC"). GPC held shares of PTI from 1998 until 2010, and it provided

management services to PTI during that time. The purpose of these payments is

undocumented, but we assume the correctness of Mr. Rogers' explanation that, in

2004,

> the other major shareholder in the business and the manager of Global
> Protection Corp had exhausted its lines of credit and borrowing
> ability and cash flow in getting the product manufactured and
> distributed. And this was some payments I made so that the boxes in
> which the product would be put on the shelf as well as the materials
> to finish the inventory. The product had been sold and this was a
> bridge to get the product to market les[t] Global Protection go under
> as well as Portfolio Technologies.
>
> THE COURT: So, when you talk about payments being made,
> you're talking about the $104,182?

MR. ROGERS: Yes.

[*13] THE COURT: All right. So the purpose of that ["PTI Subsidy" payment] was to get the product out into the stores?

MR. ROGERS: Yes. And one more time, I do not view that as a payment to Portfolio Technologies. I view that as a payment to protect my interest on the royalties and positioning the product so we can demonstrate damages for both predatory pricing as well as patent infringement because they [an infringer] took our premium pricing away * * *.

Mr. Rogers' description shows that these payments were contributions to PTI's capital, made to protect Mr. Rogers' investment in PTI and his prospect of future profit from it.

FMC stock option exercise

Mr. Rogers received a stock option benefit from his former employer, FMC, which he exercised in 2004. To do so, he opened a special account at the brokerage firm Charles Schwab and, on November 24, 2009, deposited $150,000 into that Schwab account to fund the purchase. At the time of the transaction, the option price was $165,397.52, but the trading price was $251,168.54--a difference of $85,770.62, which constituted the employer-granted benefit of the option (and was close to the amount--$86,034.42--that FMC later reported on Form W-2, "Wage and Tax Statement"). Schwab paid FMC the option price ($165,397.52) plus the employee portion of tax withholding computed to be due on the gain

($30,671.24), totaling $196,068.76. The difference between that amount and

[*14] Mr. Rogers' $150,000 deposit--i.e., $46,068.76--constituted a loan or

"margin" from Schwab to Mr. Rogers. Schwab then immediately sold the FMC

shares for their market price ($251,168.54), evidently retained a portion of it to

recover its loan ($46,068.76) plus a few days of interest thereon, and therefore

owed Mr. Rogers approximately $205,000 on this transaction. Schwab remitted to

Mr. Rogers only $175,000, which was deposited into Mr. Rogers' account on

December 10, 2004, and thus retained a balance of about $30,000.[6]

Mr. Rogers received from FMC a Form W-2 reporting wage income of

$86,034.32, and petitioners reported that amount on their return as wages.

Mr. Rogers also received a Form 1099 from Schwab, reporting the entire

$251,168.54 of gross proceeds of the stock sale, and petitioners reported that

amount on Schedule D, "Captial Gains and Losses", of their return, but they

reported zero gain from the transaction--consistent with their having already

reported their gain as wages on line 7 of Form 1040, "U.S. Individual Income Tax

Return".

When the IRS later examined petitioners' return and analyzed their bank

---

[6]The record does not show whether or when Schwab repaid this $30,000 balance to Mr. Rogers, but the fact is immaterial since, if and when it was paid, it was a return of capital to Mr. Rogers.

deposits, it found the Schwab deposit of $175,000, saw no such income item [*15] reported on the return, and concluded it was taxable receipts from Mr. Rogers' Schedule C activity.  (It was not.)

Notice of deficiency and Tax Court petition

The IRS examined petitioners' 2004 income tax return and, in that process, performed the bank deposits analyses described above.  The IRS determined that petitioners had unreported income and claimed improper and excessive deductions.  Respondent issued a statutory notice of deficiency to petitioners determining a deficiency in tax, as well as additions to tax and penalties under sections 6651(a)(1) and 6662, and petitioners timely petitioned this Court.

## OPINION

I.    General principles

A.    Burden of proof

The IRS's determinations are presumed correct, and taxpayers generally bear the burden to prove their entitlement to any deductions they claim. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Taxpayers must satisfy the specific requirements for any deduction claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  "[S]tatements in briefs * * * do not constitute evidence", Rule 143(c), and cannot supplement the record,

Niedringhaus v. Commissioner, 99 T.C. 202, 214 n. 7 (1992).  Rather, taxpayers

[*16] must carry the burden of proof with evidence offered at trial, which their

briefs should cite.[7]  Where the evidence presented at trial is insufficient to support

that a particular expense is deductible, we must sustain the IRS's determinations

and disallow the deduction.

Petitioners contend that, with respect to the $50,000 deposit from Sugarloaf

to petitioners' individual bank account, the burden of proof shifts to respondent

under section 7491(b), which provides that the burden shifts as to "any item of

income which was reconstructed by the Secretary solely through the use of

statistical information on unrelated taxpayers".  But in fact, respondent used

petitioners' own bank records to reconstruct their income, and not "statistical

information on unrelated taxpayers".  The burden of proof with respect to this

$50,000 deposit does not shift to respondent.  They also contend that the burden

shifts on this issue under section 7491(a)(1), which shifts the burden when (among

---

[7]See Rule 151(e)(3) ("All briefs * * * shall contain * * * [p]roposed findings of fact * * * based on the evidence * * *.  * * * [T]here shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement."); Adeyemo v. Commissioner, T.C. Memo. 2014-1, at *28; D'Errico v. Commissioner, T.C. Memo. 2012-149, slip op. at 19 ("We need not (and will not) undertake the work of sorting through every piece of evidence petitioners have provided in an attempt to find support for petitioners' ultimate legal positions taken in this case").

other things) a taxpayer "introduces credible evidence with respect to any factual

**[*17]** issue". But in fact, as to the factual issue of repayment of a supposed loan

by Mr. Rogers to Sugarloaf, petitioners introduced no loan documents nor any

accounting records to corroborate Mr. Rogers' testimony. "Credible evidence"

was thus lacking on this issue, and the burden of proof did not shift.

B.      Record-keeping

Section 6001 requires that--

> Every person liable for any tax imposed by this title, or for the
> collection thereof, shall keep such records, render such statements,
> make such returns, and comply with such rules and regulations as the
> Secretary may from time to time prescribe. * * * [Emphasis added.]

Taxpayers are thus required to keep sufficient records to substantiate their gross

income, deductions, credits, and other tax attributes. See also 26 C.F.R.

sec. 1.6001-1(a), Income Tax Regs. Taxpayers must retain their books and records

as long as they may become material:

> (e)  Retention of records.--The books or records required by
> this section shall be kept at all times available for inspection by
> authorized internal revenue officers or employees, and shall be
> retained so long as the contents thereof may become material in the
> administration of any internal revenue law. [Emphasis added.]

26 C.F.R. sec. 1.6001-1(e). The failure to keep and present such records counts

heavily against a taxpayer's attempted proof. For many of the disputed deductions

in this case, petitioners lack real business records, and they attempt to rely on bank [*18] records of commingled personal and business activities, reconstructions, and disorganized receipts.

C.      Deductible character

To prove entitlement to deduct an expense, the taxpayer must prove not only the fact of the expenditure but also the business purpose (or other deductible character) of the expense. "Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business". 26 C.F.R. sec. 1.162-1(a), Income Tax Regs. (emphasis added). The taxpayer must show that a reported business expense was incurred primarily for business rather than personal reasons and that there was a proximate relationship between the expense and the business. Walliser v. Commissioner, 72 T.C. 433, 437 (1979). With respect to most of the deductions disallowed in this opinion, petitioners were unable to prove that the expenditures were ordinary and necessary business expenses (as opposed to personal expenditures or capital expenditures).

II.     $175,000 from FMC stock option transaction

During the course of its examination, the IRS determined that a $175,000 deposit from Charles Schwab was includable in petitioners' gross income. At trial

Mr. Rogers persuasively demonstrated that the deposit arose from a stock option [*19] transaction with his former employer, FMC. The $86,000 of gain from that transaction was in fact reported by petitioners on their Form 1040 as wages, and we have found that the remainder of the proceeds constituted a return of capital. Petitioners therefore realized no unreported income in conjunction with the $175,000 deposit.

III.    Petitioners' unreported business income

Respondent contends that petitioners failed to report on their 2004 Form 1040 certain amounts that Mr. Rogers received from his business activities.[8] Gross income includes all income from whatever source derived. Sec. 61. Every taxpayer must keep records sufficient to determine the taxpayer's tax liability. Sec. 6001; see also sec. 1.6001-1(a). Where the taxpayer does not keep books and records sufficient to determine taxable income, the IRS may reconstruct income by examining the taxpayer's bank accounts. DiLeo v. Commissioner, 96 T.C. 858,

---

[8]Respondent contends that Mr. Rogers had no real, distinct Schedule C activity; but respondent does argue that the items are taxable income, and respondent stipulated that PPI paid Mr. Rogers $178,000 and that he did report it on Schedule C. That reporting appears appropriate, and we therefore treat that amount (plus the $10,000 from Peninsula Yorkshire Fund and the $50,000 from Sugarloaf) as Schedule C income. The $20,000 from Jetstream, the $9,000 from Abingdon, and the additional $235,000 from PPI are items properly reported on Schedule E, "Supplemental Income and Loss".

867 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). Under the bank deposits method of

**[*20]** reconstructing income, all bank deposits are prima facie evidence of income.

Parks v. Commissioner, 94 T.C. 654, 658 (1990). All money deposited into a

taxpayer's bank account during the relevant period constitutes taxable income so

long as the Government accounts for the non-taxable source of any income of

which it has knowledge. DiLeo v. Commissioner, 96 T.C. at 867.

To support its determinations, the IRS analyzed the deposits to petitioners'

personal bank account in order to reconstruct petitioners' income for the tax year

2004. After accounting for amounts (totaling $450,703) that the parties stipulated

were reported on line 7 of petitioners' Form 1040 as wage income, the IRS's bank

deposits analysis identified a total of $677,000 of additional deposits into

petitioners' personal bank account. Of that amount, the $175,000 deposit from the

stock option transaction constituted a non-taxable return of capital. Mr. Rogers

reported only $284,600 on his Schedule C.

A.    Income amounts to be determined under Rule 155

Of the $502,000 of deposits to be accounted for, $264,000 was distributions

from Mr. Rogers' business entities, the tax consequences of which will be

determined under Rule 155, as explained below.

[*21]     1.     <u>$235,000 from PPI</u>

The parties agree that Mr. Rogers received deposits totaling $413,000 in 2004 from PPI, an S corporation owned entirely by Mr. Rogers.  As we have noted, the parties also agree that $178,000 of that total was commissions paid to Mr. Rogers and properly accounted for as "Gross Income" on his Schedule C. Mr. Rogers asserted at trial that the remaining PPI deposits totaling $235,000 were distributions to him from PPI over the course of the 2004 tax year, that they were exceeded by $395,900 of contributions to PPI's capital that Mr. Rogers made during 2004, and that PPI's distributions to Mr. Rogers should be taxed according to the applicable S corporation rules.  Respondent made no legal or statutory argument to the contrary, and we hold that the tax rules governing S corporations will determine the tax treatment of the $235,000 PPI distributed to Mr. Rogers in 2004, just as equivalent amounts were determined for 2003 in <u>Rogers I</u>:

> On its face, the * * * [$235,000] transfer[red] from PPI to Rogers is a distribution from an S corporation to a shareholder. Generally, section 1368(b) provides that distributions from an S corporation with no accumulated earnings and profits (E&P) of a predecessor C corporation are not included in the gross income of the shareholder to the extent that they do not exceed the adjusted basis of the shareholder's stock, and any excess over adjusted basis is treated as gain from the sale or exchange of property.  If the S corporation has accumulated E&P of a predecessor C corporation, then the portion of the distributions in excess of the S corporation's accumulated adjustment account (AAA) is treated as a dividend to the

**[\*22]** extent it does not exceed the accumulated E&P.  Sec.
1368(c)(1) and (2).  The AAA is intended to measure the accumulated
taxable income of an S corporation that has not been distributed to the
shareholders.  See Williams v. Commissioner, 110 T.C. 27, 30
(1998).  The portion of a distribution to a shareholder that does not
exceed the AAA is a nontaxable return of capital to the extent of the
shareholder's adjusted basis in S corporation stock.  Sec. 1368(b) and
(c)(1).  The AAA is increased for the S corporation's income and
decreased for the S corporation's losses and deductions and for
nontaxable distributions to shareholders.  See secs. 1367 and 1368.

Section 1366(a)(1) provides that a shareholder shall take into
account his or her pro rata share of the S corporation's items of
income, loss, deduction, or credit for the S corporation's taxable year
ending with or in the shareholder's taxable year.  Section 1367
provides that basis in S corporation stock is increased by income
passed through to the shareholder under section 1366(a)(1), and
decreased by, inter alia, distributions not includable in the
shareholder's income pursuant to section 1368.

Unless a statutory or legal principle applies to remove the
[$235,000] distribution from the S corporation rules described above,
these rules will govern whether the * * * [$235,000] distribution from
PPI to Rogers is income to petitioners and, if so, the character of that
income. * * * [Rogers I, slip op. at 9-11.]

Consequently, here, as in Rogers I, "[a] Rule 155 computation of PPI's E&P and
AAA, as well as Rogers' basis in his PPI stock, is required to make a final
determination" of the taxability of the $235,000 distribution from PPI.  Id.
at 17-18.

**[\*23]**  2.  <u>$20,000 from Jetstream</u>

The IRS identified $20,000 deposited into petitioners' account from Jetstream, a British Virgin Islands company wholly owned by PPI during 2004 and disregarded for Federal income tax purposes.  Mr. Rogers disputes the IRS's categorization of this amount as gross income.  At trial, he claimed that this amount was a "return of principal" from Jetstream for amounts advanced to Jetstream through PPI.  As Jetstream was disregarded for U.S. Federal income tax purposes, these amounts will be treated in the same way as the $235,000 in deposits to petitioners' account from PPI--i.e., according to the S corporation rules.

##### 3.  <u>$9,000 from Abingdon Trading, LLC</u>

The IRS determined that $9,000 deposited from Abingdon was includable in petitioners' gross income.  Mr. Rogers testified at trial that the $9,000 deposit received from Abingdon was a partnership distribution to a partner and was not includable in his gross income. Section 731 provides that no gain or loss shall be recognized on a distribution from a partnership to a partner, unless the amount distributed exceeds the adjusted basis of the partner's interest in the partnership immediately before the distribution.  Mr. Rogers must therefore establish his basis in Abingdon.  At trial, Mr. Rogers attempted to offer the 2004 Schedule K-1,

[*24] "Partner's Share of Income, Deductions, Credits, etc.", issued to him by Abingdon. Even though the Schedule K-1 was inadmissible to prove the fact for which it was offered at trial,[9] we find that it should be admitted simply to corroborate Mr. Rogers' contention that he was a member of Abingdon. Abingdon elected partnership status for the 2004 tax year. The $9,000 deposit will therefore be governed according to the applicable partnership rules as a distribution from a partnership.

B.     Amounts includable in petitioners' gross income

As to the remaining deposits, Mr. Rogers identified at trial the source of each of the deposits and contended that no part of the deposits should be includable in gross income. We find each argument unpersuasive for the reasons discussed below.

1.     $50,000 from Sugarloaf

A $50,000 deposit into petitioners' account was a check from Sugarloaf. Mr. Rogers asserted that this deposit was repayment of a loan that he had

---

[9]Mr. Rogers offered the Schedule K-1 to substantiate a deduction that had been reported on the Schedule K-1 but not claimed on petitioners' Form 1040 for 2004. Upon objection by the IRS, the Court declined to admit the return into evidence because it was not probative of any issue raised in the notice of deficiency, addressed matters not pleaded in the pleadings, and was not exchanged two weeks before trial (as required by the standing pre-trial order issued September 21, 2011).

[*25] previously made to Sugarloaf.  However, the record contains no evidence of loan arrangements between Sugarloaf and Mr. Rogers.  Accordingly, we sustain the IRS's determination regarding this amount as includable in gross income pursuant to section 61.

### 2.  $10,000 from Peninsula Yorkshire Fund

The IRS identified as income $10,000 deposited into petitioners' bank account from Peninsula Yorkshire Fund.  Mr. Rogers admits that he served as trustee for Peninsula Yorkshire Fund during 2004, and that the $10,000 deposited into his bank account constituted trustee's fees.  Therefore, the $10,000 deposit from Peninsula Yorkshire Fund is includable in the petitioners' gross income pursuant to section 61.[10]

### 3.  $178,000 from PPI

The parties have stipulated that $178,000 of the $413,000 in deposits from PPI to petitioners' account is for payment of commissions, deductible by PPI as an ordinary and necessary business expense and includable in petitioners' gross income pursuant to section 61.  Mr. Rogers admits that the $178,000 is taxable but

---

[10]Mr. Rogers' contention as to Peninsula Yorkshire Fund is that the $10,000 it paid him is part of what he did report on his Schedule C, so that he should not be required to report it again.  Our reconciliation in part III.D below assures that this amount is not double-counted.

[*26] emphasizes that the $284,600 reported as gross receipts on his Schedule C includes the $178,000 of commission payments--a point we vindicate in part III.D below.

D.    Recomputing petitioners' taxable income for tax year 2004

The universe of bank deposits to be accounted for in determining Mr. Rogers' unreported income is $677,000. This opinion accounts for it as follows:

- As to $175,000 paid by Charles Schwab, we hold that it does not relate to Mr. Rogers' Schedule C activity and does not increase petitioners' taxable income above what they reported.

- As to $264,000 (i.e., $235,000 paid by PPI, $20,000 by Jetstream, and $9,000 by Abingdon), its taxability to Mr. Rogers will be determined under Rule 155.

- As to $178,000 paid by PPI, the parties stipulate that it is taxable receipts.

- As to the remaining $60,000 (i.e., $50,000 paid by Sugarloaf and $10,000 by Peninsula Yorkshire Fund), we hold that it is taxable.

Thus, Mr. Rogers' taxable Schedule C receipts in 2004 totaled $238,000 (i.e., $178,000 plus $60,000), and he reported $284,600. However, we have held that petitioners' taxable income is subject to being increased, in the Rule 155 computations, by some or all of the $264,000 of distributions from PPI, Jetstream, and Abingdon.

**[*27]**   In so holding, we avoid the double-counting about which Mr. Rogers was concerned.  Respondent did not contend--and we do not hold--that the amounts found taxable here should simply be added to the income that Mr. Rogers reported.[11]  Rather, we determine the taxable receipts and then compare them to what petitioners reported, increasing petitioners' gross income only by the difference.

IV.    Schedule C expenses

Mr. Rogers filed a Schedule C with petitioners' 2004 tax return, on which he claimed deductions related to his business activities.  Pursuant to section 162(a), a taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  In contrast, except where specifically enumerated in the Code, no deductions are allowed for personal, living, or family expenses.  Sec. 262(a).  Because Mr. Rogers blended his personal expenses with his professional work, this case requires distinguishing and allocating deductions between personal and business expenses.  However,

---

[11]The amount Mr. Rogers reported on Schedule C seems to have been arbitrary, with no visible relation to any of the amounts in the record.  Apart from the parties' stipulation that what he reported on Schedule C included the commissions portion (i.e., $178,000) of the PPI deposits, we do not know (and do not need to determine) how Mr. Rogers computed the $284,600 he reported.

[*28] Mr. Rogers' allocations and distinctions were often not credible, when they were made at all.

### A.    Interest

Mr. Rogers deducted $25,000 for "Other Interest". "Personal interest" is generally not deductible.  Sec. 163(h)(1).  Non-deductible "personal interest" is defined as any interest other than six listed categories of interest.  See sec. 162(h)(2).  Therefore, to deduct an interest expense, taxpayers must establish that the interest falls within a listed category.  Mr. Rogers claims that the $25,000 deducted as "Other Interest" was in the first category--i.e., interest "paid or accrued on indebtedness properly allocable to a trade or business".  Sec. 163(h)(2)(A).  Generally, taxpayers may deduct business-related interest payments after establishing that:  (1) the payment made was "interest", sec. 163(a); (2) it was paid or incurred within the taxable year at issue, id.; (3) it was paid on "an existing, unconditional and legally enforceable obligation for the payment of money";[12] (4) the indebtedness belonged to the taxpayer seeking the deduction;[13]

---

[12]First Nat'l Co. v. Commissioner, 289 F.2d 861, 865 (6th Cir. 1961), rev'g and remanding 32 T.C. 798 (1959).

[13]Sec. 163(a); Arcade Realty Co. v. Commissioner, 35 T.C. 256, 262 (1960). A taxpayer may not deduct interest on another's indebtedness.  Arcade Realty Co. v. Commissioner, 35 T.C. at 262; Teitelbaum v. Commissioner, 346 F.2d 266, 270

(continued...)

**[*29]** and (5) the payments are "properly allocable to a trade or business",

sec. 163(b)(2(A).

The parties agree that the payments deducted on Mr. Rogers' Schedule C were actually interest; that they were paid or incurred in the 2004 taxable year; that the payments were made on valid, existing indebtedness; and that the interest payments claimed were on indebtedness that belongs to petitioners. At issue is whether the payments were "properly allocable to a trade or business"--i.e., whether Mr. Rogers established the business purpose of the interest payments. We hold that he did not.

Mr. Rogers' testimony and supporting documentation did not establish how much was borrowed as principal or how the borrowed funds were used, nor did he show that the money was devoted to Mr. Rogers' activities as an attorney (or other business activities). Mr. Rogers provided credit card statements to substantiate portions of the amount deducted, but these statements clearly included charges attributable to both personal and business expenses; and he made no effort to distinguish the two. We sustain the IRS's determinations regarding the nondeductibility of interest expenses claimed on Mr. Rogers' Schedule C.

---

[13](...continued)
(7th Cir. 1965).

**[\*30]** B.    <u>Insurance (other than health)</u>

Generally, premiums paid on insurance policies are deductible if the insurance coverage is ordinary and necessary for a taxpayer's trade or business, 26 C.F.R. sec. 1.162-1(a), Income Tax Regs.; but no deduction is allowed for insurance with respect to property that is not used in a trade or business, <u>Edgar v. Commissioner</u>, T.C. Memo. 1979-524.

On his 2004 Schedule C, Mr. Rogers deducted $10,401 in premiums paid on "Insurance (Other than Health)".  The parties agree that these payments were made.  At issue is their deductibility as business expenses.  Mr. Rogers testified at trial that the policies were for "automobiles, liability, umbrella policy and damage to 162 Abingdon Avenue and possibly to the [Manitou] house. I haven't tried to, you know, be more specific."  This testimony was not sufficient to prove the business character of the insurance purchased.  The only documentary evidence petitioners offered is an expense log created by Mr. Rogers which documents payment of the premiums.  No policy documents were provided, and no further testimony was given at trial regarding the business purpose of these insurance policies.  Moreover, the record shows that the proceeds from at least one policy provided supplemental income to petitioners during Mr. Rogers' transition from one law firm to another.  Because the evidence fails to substantiate the business

[*31] purpose of the insurance (and in some cases even proves that the policy clearly produced taxable income to Mr. Rogers), we sustain the IRS's determinations as to insurance premium deductions.

C.      Travel, meals and entertainment

Taxpayers may deduct "traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business". Sec. 162(a)(2); Commissioner v. Flowers, 326 U.S. 465 (1946). However, travel, meals, and entertainment expenses are subject to especially strict substantiation rules. Sec. 274(d) (flush language); Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); 26 C.F.R. sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). When section 274(d) applies, a taxpayer must substantiate by adequate records or sufficient evidence corroborating the taxpayer's own statement: (1) the amount of the expense; (2) the time and place the expense was incurred; (3) the business purpose of the expense; and (4) the business relationship of the taxpayer to other persons benefited by the expense or use, if any. Sec. 274(d)(4) (flush language); see also Shea v. Commissioner, 112 T.C. 183, 187 (1999). The substantiation requirements imposed by section 274(d) preclude use of the "Cohan

[*32] rule"[14] to estimate the amounts of deductions subject to that section. Sanford v. Commissioner, 50 T.C. at 827. Section 274(n) further limits deductions for most meal and entertainment expenses to "50 percent of the amount of such expense or item which would * * * be allowable as a deduction under this chapter."

On his Schedule C, Mr. Rogers deducted $60,144 for "Travel" expenses on line 24.a. and $3,620 for "Meals and entertainment" expenses on line 24.d. The parties agree that $2,024 of the amounts deducted for "Travel" was allowable as unreimbursed employee expense on petitioners' Schedule A. After this concession, Mr. Rogers asserts "Travel" expense deductions of $58,120 and "Meals and entertainment" expense deductions of $3,620.

Credible evidence proves that Mr. Rogers incurred $30,230 of travel expenses while conducting business on PPI's behalf. Travel itineraries prepared by Seyfarth Shaw provide independent documentation as to the business purpose, time, and date of several of Mr. Rogers' trips away from home. When combined

---

[14]Under the Cohan rule, if, in the absence of the proper records, a taxpayer provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to adequately substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of the expense and allow the deduction to that extent. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

[*33] with testimony regarding his South American dealings on PPI's behalf, we find that the travel itineraries, receipts, and credit card statements in the record meet or exceed the section 274(d) substantiation requirements for that $30,230 of travel expenses.

As for the remaining $27,890.29 of "Travel" expenses and $3,620 in "Meals and entertainment" expenses, we agree with the IRS that petitioners failed to substantiate them. Mr. Rogers produced a travel diary[15] containing underlying documentation in the form of various receipts and bills, and this documentation largely substantiates the fact of the expenditure of most of the amounts of travel expense in dispute.[16] However, the diary substantiates only the expenditure of these sums, not their business purpose. At best, all we have is general,

---

[15]The travel and expense diary was created by Mr. Rogers during the IRS's examination of his 2004 tax return to assist in the fact-gathering process. It was composed of two elements: (a) a statement of the destination and who Mr. Rogers met with; and (b) limited photocopies of some supporting documentation such as receipts or airline tickets. The non-contemporaneous portions of the diary were admitted into evidence at trial not as a contemporaneous business record or documentation, but only as demonstrative exhibits reflecting petitioners' contentions. These non-contemporaneous portions created during the audit are therefore not corroborating evidence that satisfies section 274(d). When supporting documentation proved the business purpose of an expense, it was admitted as evidence and considered by the Court.

[16]The IRS also disputes the expenditure of $6,362 claimed as travel expense deductions. Because petitioners failed to substantiate the business purpose of all remaining travel, meals, and expense deductions, we do not address this issue.

[*34] uncorroborated testimony by Mr. Rogers at trial as to the purpose of some unknown quantum of these trips. Regarding travel, meals, and entertainment expenses reported by petitioners, it is often unclear from the direct testimony where petitioners traveled to, let alone the business purpose behind the trip. The travel diary also lists expenses of individuals other than petitioners, but it offers no supporting documentation for why these expenses should be deductible by petitioners. Other trips (such as one to New Zealand) have documentation in the form of plane tickets, but lack proof of the trip's business purpose. We therefore hold that these amounts are unsubstantiated, and we sustain the IRS's disallowance of the remaining $27,890 in travel expenses and $3,620 in meals expenses.

D.    Transportation

Deductions related to passenger vehicles are subject to strict substantiation requirements under section 274(d) and section 280F(d)(4). Taxpayers must prove: (a) the amount of each separate expenditure with respect to the vehicle; (b) the exact date of the expenditure; and (c) the business purpose with respect to each expenditure. 26 C.F.R. sec. 1.274-5T(b)(6).

Taxpayers may use one of two methods to substantiate transportation expenses. One method is to substantiate each element of an automobile-related

[*35] deduction by adequate records--such as diaries or account books--that are maintained by the taxpayer "at or near the time" when the expense was incurred. 26 C.F.R. sec. 1.274-5T(c)(1) and (2). Alternatively, the taxpayer may substantiate each element of an expense with "other sufficient evidence". Id. para. (c)(3). Using this alternative method, the taxpayer must establish each element of the automobile-related deduction with a detailed personal statement corroborated by other evidence. Id. para. (c)(3)(i). A taxpayer's own statement alone is not sufficient. See Wolfgram v. Commissioner, T.C. Memo. 2010-69, slip op. at 24 ("Testimony alone, without corroborative evidence, does not satisfy the requirements of section 274(d)").

On his Schedule C, Mr. Rogers deducted $1,421 of vehicle insurance premiums on line 15, $1,359 spent on vehicle repairs and maintenance on line 21, and an additional $2,149 in unidentified "car and truck expenses" on line 9. These expenditures related to three vehicles: Mrs. Rogers' Toyota Avalon, Mr. Rogers' Mercedes S500, and petitioners' son's Jeep Cherokee. We disallow each because petitioners either: (a) used the vehicles for personal transportation, not business travel, so that section 262(a) disallows the deductions; or (b) failed to adequately substantiate their entitlement to the vehicle-related deductions, so that section 274(d) disallows the deductions. Neither Mr. Rogers' testimony nor the limited

**[\*36]** business records offered as evidence are reliable or complete enough to show the nature or quantum of the use of these vehicles. Additionally, Mr. Rogers admitted both at trial and on his return to personal use of each of the vehicles yet claimed 100% of the expenses as deductible. We sustain the IRS's disallowance of these transportation expenses.

### E. Home office

On various lines of his Schedule C, Mr. Rogers deducted, as business expenses, portions of the following amounts related to petitioners' personal residence on Abingdon Avenue:

| Item | Amount |
|---|---|
| State Farm Insurance (line 15) | $1,001 |
| Atlantic Mutual Insurance (line 15) | 2,220 |
| Replace home furnace (line 21) | 1,495 |
| Roof repair (line 21) | 3,246 |
| Removal of dead tree (line 21) | 210 |
| Lawn care (line 21) | 1,557 |
| Pest control (line 21) | 137 |
| Homeowner's assoc. dues (line 21) | 150 |
| Utilities (line 25) | 3,000 |
| Alarm (line 27) | 842 |
| Total | 13,858 |

**[*37]** Section 280A(a) provides that "no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence".  However, the "home office" exception (on which Mr. Rogers relies) allows taxpayers to deduct certain expenses which would otherwise be prohibited by section 280A(a), but only "to the extent such item[s] * * * [are] allocable to a portion of the dwelling unit which is exclusively used on a regular basis" for business purposes.  Sec. 280A(c)(1) (emphasis added).  Therefore, Mr. Rogers must establish that a portion of the home was used regularly for business purposes and that the identifiable portion was used exclusively for business purposes.

At trial Mr. Rogers identified three rooms in the house that he claimed were used for business, but he offered no testimony or evidence as to the total number of rooms in the house.  Mr. Rogers made no showing of the percentage of the home that this area constituted, aside from his unsubstantiated and implausible testimony that 50% of his home was used exclusively for business purposes.  Because credible evidence in the record does not identify a portion of the home that was used exclusively for business purpose, these deductions Mr. Rogers claimed "with respect to the use of" his home are disallowed by section 280A(a).

**[*38]** F.     <u>Unreimbursed employee expenses</u>

Because an employee's trade or business is deemed to consist of the performance of services for an employer, taxpayers may deduct expenses that are: (a) nonreimbursable, (b) related to the employee's trade or business of rendering services to the employer,[17] and (c) ordinary and necessary[18] expenses of such a trade or business. <u>See</u> <u>Lucas v. Commissioner</u>, 79 T.C. 1, 6-7 (1982). Unreimbursed employee expenses are subject to the 2% itemized deduction limitation of section 67(a).

As a tax attorney and partner, Mr. Rogers was an "employee" of the law firm of Seyfarth Shaw during 2004. While an employee of Seyfarth Shaw, Mr. Rogers incurred and substantiated the following association fees, dues, and subscriptions, reported on line 27 of his Schedule C as "Computer Services", "Continuing Legal Education", and "Dues and Subscriptions":

---

[17]An expense is related to an employee's trade or business when the employee directly benefits from the expenditure by potentially earning additional income or enhancing job performance in a way traceable to the expenditure.

[18]Expenses are "ordinary" when they are "normal, usual, or customary" in the taxpayer's trade or business. <u>Deputy v. DuPont</u>, 308 U.S. 488, 495 (1940). Expenses are "necessary" when they are "appropriate" or "helpful", even if not "indispensable" or "required". <u>Ford v. Commissioner</u>, 56 T.C. 1300, 1356 (1971), <u>aff'd per curiam</u>, 487 F.2d 1025 (9th Cir. 1973).

| [*39] Item | Amount |
|---|---|
| Tax Analysts | $3,197 |
| RIA Journal of Tax | 394 |
| Continuing education | 1,394 |
| Dues (ABA, Int'l Fiscal Ass'n, Am. Health Lawyer) | 1,321 |
| Total | 6,306 |

Seyfarth Shaw's reimbursement policy did not provide for reimbursement of the association fees, dues, and subscriptions that Mr. Rogers deducted on his Schedule C. We hold that the fees, dues, and subscriptions deducted by Mr. Rogers, though not absolutely required for his employment at Seyfarth Shaw, were "ordinary and necessary" to his activities as an attorney because they were appropriate and helpful in his work for the firm. Therefore, Mr. Rogers may deduct--subject to the 2% floor--the association fees, dues, and subscriptions listed above as unreimbursed employee expenses on his Schedule A.[19]

G. Business gifts

Mr. Rogers deducted $200 on his Schedule C for various business gifts. Section 274(b)(1) limits the deduction of the cost of any business gift to $25 per

---

[19]In addition to these items, the parties stipulated that Mr. Rogers may deduct $2,024 in travel expenses, $10 for legal library expenses, and $1,420 in dues as unreimbursed employee expenses on his Form 1040, Schedule A.

[*40] recipient per year.  A taxpayer claiming a business gift deduction must substantiate the cost and description of the gift, the date the gift was made, the business reason for the gift, and the business relationship of the recipient to the taxpayer.  26 C.F.R. sec. 1.274-5T(b)(5).

The parties agree that petitioners adequately substantiated four separate gifts of at least $25 each.  Therefore, they may deduct $100 in business gifts.  We sustain the IRS's determination regarding the remaining amounts claimed as business gift deductions because Mr. Rogers did not adequately substantiate their deductibility.

### H.  2004 "Other expenses"

On his Schedule C, Mr. Rogers deducted $26,219 for "Other expenses", listed on appendix A.  Of this amount, Mr. Rogers adequately substantiated both the expenditure and the business purpose of $14 in copying fees and $157 in subscription fees to Realtor ECommerce.  We sustain the IRS's determination regarding the remaining disputed "Other expenses" because petitioners failed to adequately substantiate the business purpose of each expenditure, as required by sections 162(a) and 262(a).  Rather, the corroborating evidence provided at trial often shows a clear mixture of personal and business expenses claimed as business

[*41] deductions; and petitioners made no efforts to distinguish business from personal expenses.

V.    PPI

A.    Gross Receipts

1.    Bank deposits

In addition to the bank deposits analysis of petitioners' personal bank account (see part III above), the IRS also performed a bank deposits analysis to determine the gross receipts of PPI for 2004.  Generally, unless otherwise provided, gross income under section 61 includes all accessions to wealth from whatever source derived.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 432 & n.11 (1955).  Moreover,

> gain * * * constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. That occurs when cash * * * is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will * * *. [Rutkin v. United States, 343 U.S. 130, 137 (1952); citations omitted.]

The economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is income.  Id.

The IRS's bank deposits analysis of the joint PPI/L&R bank account established gross deposits of $1,566,960.  From the gross deposits, the IRS

[*42] subtracted $390,263 in capital contributions made by Mr. Rogers and $67,911 in non-taxable loan proceeds to arrive at a net deposits figure of $1,108,786. In addition to the net deposits, PPI's general ledger showed income of $34,000 from Agresti, $2,000 from Peabody, and $200,000 from an unknown source. Therefore, we have found that the gross receipts of PPI equal $1,344,786--i.e., the net deposits from the joint bank account plus the undeposited income recorded on PPI's general ledger.

### 2. TEFRA jurisdiction

As he did for his 2003 year, Mr. Rogers argues that this Court lacks jurisdiction to determine whether certain amounts reported as gross receipts on PPI's tax return are income to PPI. Mr. Rogers contends: that portions of the alleged gross receipts (some of which PPI distributed to Mr. Rogers) are not income to PPI but rather are in fact funds of Sugarloaf held in trust by PPI; that this contention implicates partnership-level items of Sugarloaf Fund, LLC, a partnership subject to TEFRA; and that these issues must therefore be adjudicated at the partnership level of Sugarloaf. It is true that a partnership's partnership items must be adjudicated at the partnership level; but it is not true that the tax consequences of every transaction in which a TEFRA partnership or partner happens to be a party must be so adjudicated. A taxpayer cannot invalidate a

[*43] notice of deficiency and require the IRS to issue an FPAA simply by pointing out that his income was paid to him by an entity that happens to be a partner in a TEFRA partnership. If these payments to PPI raise tax partnership-level questions for Sugarloaf or its partners, those are not questions that we must decide here. We decide only whether Mr. Rogers, through PPI, received income. He did.[20]

---

[20]In <u>Rogers v. Commissioner</u>, 728 F.3d at 674, on very similar facts, Mr. Rogers made the same arguments for 2003 about a different partnership, Warwick Trading, LLC (which was his 2003 equivalent to Sugarloaf):

> Rogers had created PPI--which plays a critical role in this case --to sit between himself and Jetstream. The tax shelter was sold to U.S. taxpayers for a total of $2.4 million. Half was the purchase price of partnership interests in Warwick. The other half appears to have been a payment to Rogers (via PPI) for creating the shelter. Rogers directed the buyers of the interests (the shelter investors) to wire the entire $2.4 million to PPI's bank account rather than Warwick's, telling them that Warwick lacked adequate banking facilities. * * *

> He argues that the $1.2 million retained by PPI (some of which, however, PPI distributed to him) was held in trust for the benefit of Warwick and that therefore the alleged tax deficiency was a "partnership item" and so should have been resolved "at the partnership level," * * * and so not in this case, which is about personal not partnership income. * * *

The Court of Appeals for the Seventh Circuit disposed of the argument succinctly: "But the Tax Court ruled in the present case that the money received by PPI and either retained by it or distributed to Rogers but not forwarded to Warwick was not held in trust for Warwick--it was PPI's money--and so <u>the tax status of that money</u>

(continued...)

**[\*44]**      3.      <u>Funds not held in trust</u>

As he asserted for 2003 in <u>Rogers I</u>, Mr. Rogers asserts here that certain unspecified funds retained by PPI and reported as gross receipts of PPI for 2004 should nonetheless be excluded from the gross receipts of PPI because the funds were held in trust for Sugarloaf. And as we did in <u>Rogers I</u> for 2003, we find here that Mr. Rogers did receive income, because the money received by PPI in 2004-- and subsequently either retained by it or distributed to Mr. Rogers--was not held in trust for Sugarloaf.

Here, as he did for 2003, Mr. Rogers provides no documentation evidencing a trust between PPI and any third party, and we find no credible evidence in the record of such an agreement. Mr. Rogers again responds that no specific words of trust are required. However, as was the case for 2003, this leaves him only the option of a constructive trust:

> [A constructive trust] indeed usually lacks documentation -- because it's not a real trust. <u>Restatement (Third) of Restitution & Unjust Enrichment</u> § 55, comment b (2011). It is a remedy for unjust enrichment: "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." <u>Beatty v. Guggenheim Exploration Co.</u>, 122 N.E. 378, 386 (N.Y. 1919) (Cardozo, J); see also 1 Dan B. Dobbs, <u>Dobbs Law of Remedies</u>

---

[20](...continued)
was not an issue for resolution in a partnership-level case." <u>Id.</u> (emphasis added).

**[*45]** § 4.3(2), pp. 589-90 (2d ed. 1993). But Rogers is not arguing that PPI, which he controls, converted or otherwise wrongfully deprived [Sugarloaf] of any money or other property; and if it had, that could hardly generate a tax benefit for Rogers, for he would be the wrongdoer.

Nevertheless, there is <u>something</u> to Rogers' trust argument, though not enough. An agent receiving funds on behalf of his principal has a fiduciary duty to maintain the principal's funds in a segregated account. <u>Restatement (Third) of Agency</u> § 8.12 and comment c (2006); c.f. <u>Rodriguez v. Herman</u>, 121 F.3d 1352, 1356 (9th Cir. 1997). PPI appears to have done that with regard to the * * * [investor receipts] that the shelter investors were paying for the partnership interests. For it forwarded that amount to * * * [Sugarloaf] for distribution * * * [as commissions to other companies which incurred costs in helping administer the tax shelter]. [<u>Rogers v. Commissioner</u>, 728 F.3d at 675.]

Mr. Rogers' own tax reporting for 2004 was at odds with his contention that a certain portion (in fact, an unspecified amount) of the funds was held "in trust" by PPI. Mr. Rogers himself paid tax on a portion of this money (the $178,000 compensation for his services to PPI on his Schedule C), a characterization that is inconsistent with his having held the money in trust.[21] Finally, even if we were to

---

[21]As the Court of Appeals for the Seventh Circuit observed in affirming <u>Rogers I</u>:

Worse, if Rogers was holding in trust the money he received from PPI and then using it to reimburse himself for legal services, he was committing a grave breach of trust. He thus is driven to argue both that the money was in trust and so not taxable to him and that it was his personal property and so he committed no ethical or legal

(continued...)

[*46] accept in principle Mr. Rogers' argument that certain amounts deposited with PPI were held in trust, Mr. Rogers provided no evidence substantiating which amounts were held in trust (and were later sent to Sugarloaf Fund or used to pay Sugarloaf Fund's expenses). Therefore, his evidence does not support a finding that any particular amounts paid to PPI are not income to PPI.

### 4. Conclusion

In conclusion, PPI reported $846,066 in gross receipts on its 2004 Form 1120S and received an additional $425,000 from Sugarloaf in 2004, and petitioners did not include this amount in the gross receipts of PPI on its 2004 return. Its total taxable receipts were therefore $1,271,066.

### B. Deductions

After stipulations and concessions by the parties, the parties dispute the validity of more than $800,000 in business expense deductions claimed for PPI on petitioners' 2004 Schedule E, "Supplemental Income and Loss". We hold that, with limited exceptions, petitioners have not substantiated either the expenditure

---

[21](...continued)
violations in using it to defray personal expenses. That is a tightrope that no one can walk. * * * [Rogers v. Commissioner, 728 F.3d at 675; citations omitted.]

[*47] or the business purpose (or both) of these expenses and that--subject to those limited exceptions discussed below--we will sustain the IRS's disallowance.

### 1. Insurance

PPI deducted $9,778 for payment of insurance premiums on line 19 of its Form 1120S.  A taxpayer may deduct insurance premiums if the insurance coverage is ordinary and necessary for the taxpayer's trade or business.  26 C.F.R. sec. 1.162-1(a).  However, as we noted above, no deduction is allowed for insurance with respect to property that is not used in a trade or business.  Edgar v. Commissioner, T.C. Memo. 1979-524.  Despite the parties' stipulation that PPI actually spent $6,606 on insurance premiums, Mr. Rogers failed to substantiate the business purpose of the insurance coverage.  He offered no policy documents for these premiums, nor did he testify at trial as to the business purpose of the expense.  Because Mr. Rogers failed to prove that the insurance was with respect to property used in his trade or business, we will sustain the disallowance of this deduction.

### 2. Repairs and maintenance

PPI deducted $3,670 for "Repairs" and $4,886 for "Maintenance" on its 2004 Form 1120S.  These expenses included deductions for lawn care at various properties personally owned by petitioners and expenses to repair a vehicle which

**[*48]** was used by their son both personally and for business. However, expenses that relate to a taxpayer's home must meet the strict substantiation requirements imposed by section 280A. Sec. 280A(a); see part IV.E above. Expenses related to vehicles must meet the equally stringent substantiation requirements of section 280F. See part IV.D above. Because petitioners did not substantiate the business purpose of these expenses, we sustain the IRS's determination related to this deduction.

### 3. Supplies

PPI deducted $21,220 for "Supplies". PPI spent at least part of this amount on furnishings and other expenses for petitioners' son's residence, gasoline for a mixed personal- and business-use vehicle driven by petitioners' son, and other personal items purchased for petitioners. Though credit card statements substantiate that the amounts were paid by petitioners or PPI, the charges on the statements were to general retailers. Petitioners offered no itemized receipts, and no effort was made to distinguish which of these charges were personal and which were for business purposes. Without substantiation of the business purpose behind these expenses, we sustain the disallowance of this deduction.

**[\*49]**      4.      <u>Telephone</u>

Section 262(a) denies deductions for "personal, living or family expenses", and pursuant to section 262(b), any charge for the first telephone line to a residence of the taxpayer is treated as a personal expense.  PPI deducted $14,881 for telephone expenses.  To substantiate the deduction, petitioners offered an expense log, credit card statements, assorted billing statements, and canceled checks.  However, neither the expense log nor Mr. Rogers' testimony at trial distinguished which portion of the telephone expense was for the first line to petitioners' residence, nor which business entity used which telephone line.  Moreover, the evidence in the record shows that a substantial majority of the charges were billed to, or related to telephone services which were provided at, petitioners' residence on Abingdon Road.  Again, no credible evidence distinguishes what portions of the expenses were for personal or business purposes.  We therefore sustain the disallowance of this deduction.

     5.      <u>Automobile</u>

PPI deducted $3,103 on its Form 1120S for "Automobile" expenses.  At trial, Mr. Rogers testified that this amount was spent on gasoline used by petitioners' son and sometimes in one of petitioners' personal automobiles.  However, petitioners did not substantiate the business purpose of these expenses,

[*50] and again cannot meet the heightened substantiation requirements of sections 274(d) and 280F. See part IV.D above. We therefore sustain the disallowance of this deduction.

### 6. Rent

PPI deducted $23,739 in "Rents". Of this amount, the IRS conceded that $15,383 was deductible as rent paid to Palos Bank for office space rented by PPI in Homer Glen. The deductibility of the remaining $8,356 is in dispute, though the IRS concedes that amount was spent by petitioners. At trial, petitioners testified that the disputed amount consists of expenditures to rent vehicles, and a hotel in Florida. Petitioners did not substantiate the business purpose of the remaining expenses and also failed to meet the stringent substantiation requirements imposed by section 274(d) for travel expenses and transportation expenses. See part IV above. We therefore sustain the disallowance of the remaining amounts claimed as "Rents" deductions.

### 7. Commissions

PPI deducted $365,608 for "Commissions" in 2004. Commissions paid in connection with carrying on a trade or business are deductible under section 162 if they are ordinary and necessary expenses. 26 C.F.R. sec. 1.162-1(a). PPI carried on a trade or business, and the parties agree that PPI actually paid $363,607 in

[*51] commissions in 2004. At issue is whether the commissions were ordinary and necessary expenses--i.e., whether petitioners proved the business purpose of these expenses.

Of the $363,607 paid, the parties stipulate that commissions totaling $271,052 are deductible as follows: $178,000 paid to Mr. Rogers is deductible by PPI; and $93,052 is deductible by L&R, not PPI. The deductibility of the remaining $92,555 is in dispute.

At trial, Mr. Rogers provided an executed consulting agreement between PPI and Portfolio Asset Recovery Consultoria e Assessoria Empresarial LTDA for services related to PPI's conduct of Brazilian receivables activities, as well as evidence of payment of $50,000 as provided by the terms of the agreement. Further evidence in the record, combined with Mr. Rogers' plausible testimony at trial, substantiates deductions for the remaining $42,465, i.e., $25,000 paid to Multicred Investamentados Limitada ("Multicred"), a Brazilian collection company, and $17,465 in various other commissions related to proper PPI business purposes.

**[\*52]**      8.      <u>Parking</u>

PPI deducted $1,306 in parking expenses on its Form 1120S.  Deductions claimed for parking are subject to the strict substantiation requirements imposed by section 274(d).  Sec. 274(d)(1); 26 C.F.R. sec. 1.274-5T(a)(1).  Though petitioners adequately substantiated the expenditure of this amount, they failed to substantiate how the parking expenses related to PPI's business.  We therefore sustain the disallowance of this deduction.

9.      <u>Meals and entertainment</u>

Expenses for meals and entertainment are deductible if the taxpayer provides the substantiation required by section 274(d).  <u>See</u> part IV.C above. Section 274(n) limits deductions for most meal and entertainment expenses to "50 percent of the amount of such expense or item which would * * * be allowable as a deduction under this chapter."

PPI deducted $12,054 in expenses for meals and entertainment.  Petitioners adequately substantiated $402 in meals expenses (before the 50% limit of section 274(n) is applied) which correspond to the dates that Mr. Rogers traveled on PPI business.  The remaining meals and entertainment expenses lack sufficient documentation to prove their business purpose.  Therefore, we sustain the

[*53] disallowance of the claimed deductions for meals and entertainment, except for $402 (subject to the 50% limit).

### 10. Travel

Travel deductions are subject to the stringent reporting requirements of section 274(d). See part IV.D above. PPI claimed $19,554 in travel deductions. The parties agree that $1,067 of the amount claimed is properly deductible. Further, petitioners concede that $5,093.95 is not deductible. The deductibility of $13,393.05 remains in dispute, though the IRS agrees that the expenditures were made. However, petitioners again fail to meet the stringent substantiation requirements of section 274(d) for travel deductions, specifically with respect to the business purpose of the expenses. See part IV.D above. There is no documentation as to the business purpose of the remaining amounts outside of Mr. Rogers' unsupported testimony at trial or the demonstrative portions of the travel diary. We sustain the IRS's determination regarding the remaining $13,393.05 in travel expenses.

### 11. Legal Fees

PPI deducted $316,628 of "Legal & Professional" fees. The parties agree that PPI spent only $191,628, and the IRS conceded that $3,491 of the $191,628 spent is deductible by PPI. The parties dispute the deductibility of the remaining

[*54] $188,137. Ordinary and necessary expenses for legal fees paid or incurred during the taxable year in carrying on a trade or business are allowed as deductions. Sec. 162; 26 C.F.R. sec. 1.162-1(a). However, "[b]usiness expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business." 26 C.F.R. sec. 1.162-1(a) (emphasis added).

To substantiate this deduction, Mr. Rogers first provides invoices from the law firm Seyfarth Shaw to Sugarloaf c/o Multicred, and evidence in the record suggests that PPI did in fact pay these amounts. However, Mr. Rogers fails to demonstrate why PPI is the proper entity to deduct these legal expenses. Sugarloaf is an LLC that elected to be classified as a partnership for Federal income tax purposes for the 2004 tax year. Items of income and deduction are determined under applicable partnership statutes at the partnership level. Secs. 701, 703. Because petitioners failed to substantiate how these legal expenses were incurred on behalf of PPI, PPI is not entitled to deduct these amounts.

Petitioners presented further evidence that PPI paid legal fees and expenses to Seyfarth Shaw, Paul J. Kozacky & Associates, and Chris Saternus. The record does not substantiate what business purpose entitled PPI to deduct these legal expenses. The evidence of payment either bears notations that the fees related to

[*55] PTI (Mr. Rogers' unrelated entity), not PPI, or contains no indication of the scope or nature of the underlying work. Though the invoices were addressed to PPI, the descriptions of the work contained in the invoices related to patent infringement claims brought by PTI. The record does not contain any indication that PPI had an ownership interest in PTI or in the patent litigation related to PTI. Therefore, we sustain the disallowance of these deductions.[22]

Finally, petitioners provided evidence of amounts paid to Seyfarth Shaw, the law firm of Altheimer & Grey, and entities named "ATU General Trust BVI" and "Chicago Title Insurance", for which the evidence includes no underlying invoice or statement of work. Given that other evidence in the record shows that PPI deducted expenses for work on matters related to PTI that were not ordinary

---

[22]Petitioners' only claim for deduction of these items is that they are an ordinary and necessary business expense incurred by PPI, an entity whose income, losses, deductions, and credits flow through to petitioners. Mr. Rogers testified that he did not know whether he had an ownership interest in PTI in 2004. A close examination of the record discloses that Mr. Rogers at one time was a shareholder of PTI, but the evidence is inconclusive as to whether he was during the 2004 tax year at issue. Regardless, petitioners provided no evidence that PPI had any interest in PTI; and we disallow the deduction for that reason. Since petitioners advance no other theory as to why these expenses should be deductible as flow-through deductions or otherwise, we consider no other alternative arguments.

[*56] and necessary to PPI's business purpose,[23] it is impossible to determine from the record whether the work was related to PPI's business purposes. Nor can we rule out the likely possibility that this legal work, too, was for PTI. We therefore sustain the disallowance of these deductions.

### 12. PTI Subsidy

PPI deducted $104,182 for a "PTI Subsidy". However, the "PTI Subsidy" consisted of two payments made by Mr. Rogers that have no apparent connection to PPI. He made the payments to GPC (a co-owner of PTI) to fund the continued operation of PTI--and protect his investment in it--when it was experiencing difficulty as a result of infringement by a competitor. While this money may have been used to pay ordinary and necessary expenses of PTI, for Mr. Rogers it was not a deductible expense but a capital expenditure. See Koree v. Commissioner, 40 T.C. 961 (1963).

Mr. Rogers was an officer (i.e., the treasurer) of PTI during 2004, and he claims that the purpose of the "PTI Subsidy" was to protect him from potential liability for PTI's debts. He asserts that PTI was insolvent and that Illinois law imposed on him, as an officer, fiduciary liability for PTI's debts when PTI was

---

[23]In fact, one of the checks written to Altheimer & Grey bears the notation "PTI".

**[\*57]** insolvent.[24]  However, apart from Mr. Rogers' very general, summary testimony (apparently mistranscribed as "solvent" rather than "insolvent", see Tr. 55), there is no evidence that PTI was insolvent during 2004; and there is no contemporaneous evidence from 2004 to corroborate his current explanation of the purpose of the "PTI Subsidy".  And even if we were to credit his account entirely, it would not yield any deduction for PPI.

## VI.    L&R gross receipts

Petitioners argue that, despite the fact that they reported $450,000 in gross receipts on L&R's 2004 return, the entity had no gross receipts.  In the alternative, petitioners claim that, to the extent L&R is found to have had gross receipts, PPI should be able to deduct an equal amount.  However, neither argument is entirely correct.

The parties agree that PPI is not entitled to a $450,000 deduction for an amount supposedly transferred to L&R because such a transfer was never made.

---

[24]See Technic Eng'g, Ltd. v. Basic Envirotech, Inc., 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999) (extending fiduciary duties during insolvency to officers as well as directors); Atwater v. Am. Exch. Nat'l Bank of Chi., 38 N.E. 1017, 1022 (Ill. 1893) ("When a corporation becomes insolvent, its assets are regarded as a trust fund for the payment of its creditors; and the directors, who are the agents or trustees of the stockholders during the solvency of the corporation, occupy a fiduciary relation towards the creditors when the corporation becomes insolvent").

[*58] Mr. Rogers asserts that the entire $450,000 reported on L&R's 2004 return was due to this transfer and, because the transfer was never made, L&R should have a corresponding reduction in gross receipts. We agree with petitioner that L&R did not have gross receipts of $450,000 from PPI in 2004. However, as noted above, the bank deposits analysis shows that the joint PPI/L&R bank account accumulated $73,720[25] in net deposits beyond those that were attributable to PPI. Accordingly, we find in respondent's favor that L&R had $73,720 of taxable gross receipts in 2004.

VII.   Accuracy-related penalty

Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations or the portion of the underpayment attributable to any substantial understatement of income tax. Sec. 6662(a), (b)(1), (b)(2). Under section 7491(c), the IRS bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case. Once the IRS meets this burden, the taxpayer must come forward with

---

[25]PPI and L&R had a combined $1,344,786 in taxable receipts in 2004, as evidenced by PPI's general ledger and the bank deposits analysis of the joint PPI/L&R account. We have found that the amount of this total that is attributable to PPI is $1,271,066, leaving $73,720 of taxable deposits unaccounted for.

[*59] persuasive evidence that the IRS's determination is incorrect.  Rule 142(a);

Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

An understatement of an individual's income tax is substantial if it exceeds

the greater of 10% of the tax required to be shown on the return or $5,000.

Sec. 6662(d)(1).  Even though we have allowed additional deductions not allowed

in the notice of deficiency, petitioners' understatement of income tax for 2004

(which will be recomputed pursuant to Rule 155) will evidently exceed the greater

of 10% of the tax required to be shown on the return or $5,000.  Accordingly, the

Commissioner has met his burden to establish that petitioners' return reflected a

"substantial understatement".  Petitioners will therefore owe the accuracy-related

penalty on the entire amount of the underpayment for each year unless they can

successfully invoke a defense to the penalty.

The section 6662(a) penalty is not imposed if a taxpayer can demonstrate

(1) that he had reasonable cause for the underpayment and (2) that he acted in

good faith.  Sec. 6664(c)(1).  Whether a taxpayer acted with reasonable cause and

in good faith is a facts-and-circumstances decision, with the most important factor

being the extent of the taxpayer's efforts to assess his proper tax liability.

26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs.  Also important is the taxpayer's

knowledge and experience.  Id.

**[*60]** Petitioners contend that the "level of detail required of taxpayer [sic] in this process has been very abnormal even for a naked audit." However, this contention neither provides reasonable cause for petitioners' underpayment nor indicates that petitioners exercised good faith. While the IRS may have conducted a rigorous examination of petitioners' tax returns and records, the level of thoroughness of the examining agents during this process does not affect or bear upon the reporting requirements imposed by the Code. The requirement that taxpayers lawfully report their taxable income arises long before the examination process. See sec. 6001. Petitioners' record-keeping was in disarray; they failed to report large amounts of income; and they claimed substantial deductions for which they had no proof at all and others for which their proof was gravely deficient.

Petitioners are sophisticated business people. Mr. Rogers is a highly educated attorney with more than 40 years' experience dealing in a variety of complex tax matters. He was certainly able to distinguish personal from business expenses, yet the evidence he used to substantiate their deductions show that he failed to take care to make this distinction.

We find petitioners had neither reasonable cause nor good faith with regard to the positions they maintained on their return. To the extent we sustain the IRS determinations, we also sustain the corresponding accuracy-related penalty.

**[*61]**                                        <u>Conclusion</u>

The determinations in the IRS's notice of deficiency are sustained in part, as

is explained above. So that the liabilities for the year at issue can be computed,


<u>Decision will be entered under</u>

<u>Rule 155</u>.

**[*62]**                                        APPENDIX A

The following table displays (i) the expenses petitioners deducted on Schedule C of their 2004 return for various items, (ii) the amounts that the parties have stipulated petitioners are entitled to deduct, and (iii) additional amounts that, after trial, we find petitioners incurred and for which they adequately substantiated the requisite business purpose or use:

| Expense | Return | Stipulated | Additional amounts |
|---|---|---|---|
| Interest (other) | $25,000 | -0- | -0- |
| Insurance (other than health) | 10,401 | -0- | -0- |
| Repairs and maintenance | 4,117 | -0- | -0- |
| Travel | 60,144 | $2,024 | [1]$30,230 |
| Meals and entertainment | 3,620 | -0- | -0- |
| Utilities | 3,000 | -0- | -0- |
| Other expenses: | | | |
| Alarm services | 842 | -0- | -0- |
| Bank service charges | 4,861 | -0- | -0- |
| Business gifts | 200 | -0- | 100 |
| Computer services | 1,982 | -0- | [2]1,356 |
| CLE | 1,394 | -0- | [2]1,394 |
| Copying | 14 | -0- | [1]14 |
| Dues and subscriptions | 3,000 | 1,420 | [2]3,319 |

| | | | |
|---|---:|---:|---:|
| **[*63]** Legal library | 10 | 10 | -0- |
| Passport | 55 | -0- | -0- |
| Postage | 198 | -0- | -0- |
| Printing and reproduction | 410 | -0- | -0- |
| Publications | 1,555 | -0- | -0- |
| Supplies | 8,563 | 1,291 | -0- |
| Telephone | 3,135 | -0- | -0- |
| Total | 132,501 | [2]4,745 | 36,413 |

[1]Deductible on Schedule C.
[2]Deductible on Schedule A.

[*64]                                   APPENDIX B

The following table displays (i) the expenses PPI deducted on its 2004

return for various items, (ii) the amounts that the parties have stipulated PPI is

entitled to deduct, and (iii) additional amounts that, after trial, we find PPI

incurred and for which petitioners adequately substantiated the requisite business

purpose or use:

| Expense | Return | Stipulated | Additional amounts |
|---|---|---|---|
| Insurance | $9,778 | -0- | -0- |
| Repairs | 3,670 | -0- | -0- |
| Maintenance | 4,886 | -0- | -0- |
| Supplies | 21,220 | -0- | -0- |
| Telephone | 14,881 | -0- | -0- |
| Automobile and truck expense | 3,103 | -0- | -0- |
| Rent | 23,739 | $15,383 | -0- |
| Commissions | 365,608 | [1]271,052 | $92,465 |
| Parking | 1,306 | 1,306 | -0- |
| Meals & entertainment | 12,054 | -0- | [2]402 |
| Travel | 19,554 | 1,067 | -0- |
| Legal & professional fees | 316,628 | 3,491 | -0- |
| PTI Subsidy | 104,182 | -0- | -0- |
| Total | 900,609 | 292,299 | 92,867 |

**[\*65]**  [1] The parties stipulated that, of the $365,608 reported as "Commissions", $178,000 is deductible by PPI and $93,052 is deductible by L&R.

[2] Before application of the sec. 274(n) limit.